**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CURTIS DIXON, on behalf of himself and all others similarly situated, | |
| Plaintiff, | Case No. 1:24-cv-11834 |
| v. | **CLASS ACTION COMPLAINT** |
| BENJAMIN E. GATZKE; BORROWWORKS DECISION SCIENCE, INC.; BWDS, LLC; NEWPORT FUNDING LLC; TAYLOR McCABE; WILLIAM BELL; ALAN BIGBY; KATHLEEN ADAMS; TICIA CLIFF; FAWN WILLIAMSON; FRANK DONEY; and JOHN DOES 1 - 40, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

## GENERAL ALLEGATIONS

1.     Plaintiff Curtis Dixon ("Plaintiff"), on behalf of himself and all individuals similarly situated, by counsel, brings this class action to secure redress from predatory and unlawful loans made by: (i) Defendants Benjamin E. Gatzke ("Gatzke") and his companies, Defendants BorrowWorks Decision Science, Inc., and BWDS, LLC (together, "BorrowWorks" and, collectively with Gatzke, the "Gatzke Defendants"); (ii) Defendant Newport Funding LLC ("Newport Funding") and at least one other unnamed lender (together, with Newport Funding, the "Lenders"); (iii) Defendants Taylor McCabe, William Bell, Alan Bigby, Kathleen Adams, Ticia Cliff, Fawn Williamson, and Frank Doney (collectively, the "Tribal Defendants"); and (iv) John Does, 1-40 (when together with the Gatzke Defendants, the Lenders, and the Tribal Defendants, "Defendants").

2.     This is a case about a scheme to make online, short-term loans that carry interest

1

rates exceeding 600%—loans that are illegal in many states—and to do so with impunity.

3.      High interest loans target vulnerable borrowers and, left unregulated, economically devastate borrowers and their communities. Once saddled with such a predatory loan, consumers will often take out additional loans to make ends meet and to pay off other loans, creating a cycle of mounting debt.

4.      In an attempt to evade litigation and government enforcement aimed at halting these illegal lending schemes, predatory lenders have sought to cloak themselves in the sovereign immunity granted to American Indian tribes in the United States. These predatory lenders pretend to be companies created and run by tribes when, in all reality, they are run by non-tribal third parties. And, the significant profits that these companies extract from consumers do not inure to the benefit of the tribes whose immunity has been exploited. Courts routinely reject such cynical efforts to use tribal immunity to shield plainly illegal commercial conduct.

5.      At issue in this case is precisely one such predatory lending scheme.

6.      The Fort Belknap Indian Community of the Fort Belknap Reservation of Montana (the "Tribe" or "FBIC") has been convinced to enter into agreements with non-tribal outsiders to lend the Tribe's name to predatory lending operations, including Bright Lending. In exchange, the Tribe receives a small portion of these businesses' revenues.

7.      On its website, Bright Lending purports to be a tribal lending business that is owned and operated by Aaniiih Nakoda Finance, LLC DBA Bright Lending ("ANF"), which is an entity formed under the laws of, and wholly owned by, the Tribe.

8.      But ANF is a shell, with no board and no employees. ANF is purportedly managed by another tribal entity, the Fort Belknap Planning and Development Corporation, d/b/a Island Mountain Development Group ("IMDG") which, in turn, is allegedly managed by the Board of

Directors (the "IMDG Board").

9. In reality, however, non-tribal outsiders—including the Gatzke Defendants, the Lenders, and other non-tribal outsiders that Gatzke has helped line up—control IMDG and the IMDG Board and, by extension, Bright Lending. To obscure their role and hide behind the Tribe's laundered sovereign immunity, they have orchestrated a convoluted corporate structure and guaranteed that a team of non-tribal professionals, which they have hand-picked, sit at the top.

10. The Gatzke Defendants and Lenders have hidden the details of their scheme not only from the public, but also from the very Tribe behind which they seek to hide. Indeed, the Tribe's governing body, the Fort Belknap Indian Community Council (the "Council"), recently launched an investigation into IMDG's financing arrangements with the Lenders, as well as IMDG's significant and unexplained debts—debts which were especially alarming given that IMDG has reported hundreds of millions of dollars in annual revenue.

11. At the direction of the Lenders, the IMDG Board refused to provide financial information about IMDG's business activities or IMDG's arrangements with the Lenders to the Council, which, supposedly, owns IMDG. When the Council continued its investigation and, ultimately, replaced the IMDG Board over its concerns, the Lenders revolted. They seized control of IMDG's bank accounts and requested assurances that the Council would no longer "interfere" with IMDG.

12. As the foregoing and other allegations made herein demonstrate, it is abundantly clear that the Lenders and Gatzke Defendants are in control of the Bright Lending enterprise. Their predatory and illegal lending scheme cannot be shielded by the laundered sovereign immunity of the Tribe, whose supposed ownership over the operation is purely illusory.

13. Plaintiff, on behalf of himself and the Classes set forth below, seeks to recover

3

damages and penalties under state and federal law for the usurious interest and fees obtained by the Gatzke Defendants and Lenders, and also seeks injunctive and declaratory relief against the Tribal Defendants to halt their illegal practices.

## JURISDICTION AND VENUE

14.     This Court has original jurisdiction over Plaintiff's Racketeer Influenced and Corrupt Organizations ("RICO") claims under 18 U.S.C. § 1962, and 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

15.     This Court also has jurisdiction under the Class Action Fairness Act because Plaintiff and at least one Defendant are citizens of different states and the matter in controversy exceeds $5,000,000, and there are at least 100 members of each Class.

16.     This Court has personal jurisdiction over Defendants because each Defendant knowingly participated in the making of unlawful loans to Illinois residents.

17.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claims occurred in Chicago, Illinois, including in this District and Division. Additionally, venue is proper in this Court pursuant to 18 U.S.C. § 1965(a) because Defendants transacted their affairs in this District and Division.

## THE PARTIES

18.     Plaintiff Curtis Dixon is a natural person, citizen of the State of Illinois, and resident of Chicago, Illinois.

19.     Defendant Benjamin E. Gatzke ("Gatzke") is a natural person and citizen of Texas who may be found at 4400 Ledgeview Rd., Fort Worth, TX 76109. Gatzke is directly involved in the operations of the Bright Lending enterprise. Gatzke is also the principal owner and operator of other corporate entities that have been involved in the operation of Bright Lending and other tribal-

4

affiliated lending operations. Gatzke is not a member of any tribe.

20.     Defendant BWDS, LLC ("BWDS") is a limited liability company formed under the laws of the State of Delaware, with its principal place of business in Texas. BWDS is not owned by any tribal arm, entity, or member. For some or all of the relevant period, BWDS performed many of the tasks necessary to run Bright Lending's online lending enterprise. Gatzke is the Chief Executive Officer of BWDS.

21.     Defendant BorrowWorks Decision Science, Inc. ("BorrowWorks Decision Science") is a corporation formed under the laws of the State of Delaware, with its principal place of business in Texas. BorrowWorks Decision Science is not owned by any tribal arm, entity, or member. For some or all of the relevant period, BorrowWorks Decision Science performed many of the tasks necessary to run Bright Lending's online lending enterprise. Gatzke is the Chief Executive Officer of BorrowWorks Decision Science.

22.     Defendant Newport Funding LLC ("Newport Funding") is a limited liability company formed under the laws of the State of Delaware. Newport Funding is not owned by any tribal arm, entity, or member. For some or all of the relevant period, Newport Funding was the principal outside creditor of the IMDG, providing the capital necessary to run Bright Lending's online lending enterprise.

23.     Defendant Taylor McCabe is a tribal member and Chief Executive Officer of IMDG.[1] He is being sued in his official capacity only.

24.     Defendant William Bell is a tribal member and President of the IMDG Board.[2] He is being sued in his official capacity only.

---

[1]     Island Mountain Development Group, *IMDG Leadership*, https://www.islandmtn.com/about/#leadership (last visited Oct. 30, 2024).
[2] *Id.*

25.     Defendant Alan Bigby is a tribal member and Vice President of the IMDG Board.[3] He is being sued in his official capacity only.

26.     Defendant Kathleen Adams is a tribal member and Secretary/Treasurer of the IMDG Board.[4] She is being sued in her official capacity only.

27.     Defendants Ticia Cliff, Fawn Williamson, and Frank Doney are each a tribal member and Member of the IMDG Board.[5] They are each being sued in their official capacity only.

28.     Defendant John Doe Nos. 1-40 are unidentified parties who participated in the enterprise with the Defendants, including, but not limited to, individuals and entities who aided, abetted, and facilitated the conspiracy to collect the unlawful amounts from consumers.

## FACTUAL ALLEGATIONS

### A.     The Emergence of the Tribal Lending Scheme

29.     In a tribal lending scheme, a lender affiliates with a Native American tribe in an attempt to enhance the appearance of tribal ownership of the business and insulate the scheme from federal and state law. The lender does so by piggybacking on the tribe's sovereign legal status and the tribe's general immunity from suit under federal and state laws.

30.     The purpose of the scheme is clear: non-tribal schemers "use tribal immunity as a shield for conduct of questionable legality." *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2052 (2014) (Scalia, J., dissenting) (citing Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?* 69 Wash. & Lee L. Rev. 751, 758–759, 777 (2012)).

---

[3] *Id.*
[4] *Id.*
[5] *Id.*

6

31.     Tribal lending schemes are not designed to promote tribal businesses or prosperity. Rather, tribal lending schemes are contrivances aimed at avoiding state usury laws, with the vast majority of the businesses' revenue being funneled to non-tribal entities, with the tribes typically receiving a small share.

32.     In recent years, and as discussed further below, these schemes have come under increased scrutiny. In response, the predatory lenders behind these schemes have not slowed down their illegal lending operations. Instead, they have simply grown more clever and careful.

**B.      The Bright Lending Rent-a-Tribe Scheme**

**i.      The Early Years: The FBIC Partners with Numerous "Service Providers" to Enter the Online Lending Business**

33.     The Fort Belknap Indian Reservation (the "Reservation") is located in a remote part of north central Montana. The unemployment rate on the Reservation is 30% and the median household income of $42,222 is far lower than the State's median household income $60,560.[6]

34.     For years, the Tribe has helped prop up illegal tribal lending schemes in an effort to secure funds to meet Tribe members' needs.

35.     Under the Tribe's constitution, the Tribe's governing body, the Council, has the power to, *inter alia*, "manage the economic affairs of the Community," and "charter subordinate organizations for economic purposes and to regulate the activities of all cooperative associations of members of the Community."[7]

36.     In 2006, the FBIC, through the Council, passed a resolution to issue a tribal charter

---

[6] Fort Belknap Indian Community Testimony on Fiscal Year 2024 Appropriations, https://www.congress.gov/118/meeting/house/115411/witnesses/HHRG-118-AP06-Wstate-StiffarmJ-20230308.pdf (last visited Nov. 8, 2024).

[7] Constitution of the Fort Belknap Indian Community of the Fort Belknap Reservation Of Montana, https://img1.wsimg.com/blobby/go/d94bfdb9-dd85-49bd-94c2-4822ef04bf3b/downloads/1bvvpiitj_552731.pdf?ver=1730471993093 (last visited Nov. 8, 2024).

to IMDG, which was to serve "as a for-profit corporation" that would "focus and coordinate business planning and development activities" for the Reservation. (Exhibit 1 at 2.)

37.     IMDG is purportedly managed by the IMDG Board, which is appointed by the Council. However, as alleged herein, in actuality, the Gatzke Defendants and Lenders are in control.

38.     In the late 2000s, the IMDG Board set out to develop a lending operation that would offer, over the internet, small-dollar loans with ultra-high interest rates to non-tribal consumers in certain states.

39.     This operation officially launched in 2011—but only with the help of non-tribal, online lending experts and "service providers," including Gatzke. Indeed, IMDG has acknowledged that it "relied on" such third parties to run its online lending operations. (*See* Exhibit 2, ¶ 10.)

40.     Thus, from the outset, non-tribal schemers like Gatzke have controlled, funded, and/or directed the day-to-day lending operations of the Tribe's various lending entities. The tribal entities, in turn, were paid a fee based on the number of loan transactions that were completed.

**ii.     Regulators Crack Down on Tribal Lending Schemes**

41.     In the late 2010s, federal regulators began cracking down on such tribal lending schemes, with their efforts gaining significant momentum in 2017.

42.     First, in April 2017, the Consumer Financial Protection Bureau ("CFPB") filed a complaint against four online lenders for running an illegal tribal lending scheme.[8]

---

[8] Consumer Financial Protection Bureau, *CFPB Sues Four Online Lenders for Collecting on Debts Consumers Did Not Legally Owe*, https://www.consumerfinance.gov/about-us/newsroom/cfpb-sues-four-online-lenders-collecting-debts-consumers-did-not-legally-owe/ (last visited Nov. 8, 2024).

43.     Then, in October 2017, one prominent perpetrator of a tribal lending scheme was convicted of numerous federal racketeering and truth-in-lending offenses, and sentenced to 200 months, or more than 16 years, in prison.[9] His attorney was also convicted and sentenced to 84 months in prison for his role in perpetrating the illegal lending scheme.[10]

44.     Additionally, in November 2017, the CFPB filed a lawsuit against Think Finance, LLC ("Think Finance") for operating an illegal tribal lending scheme.[11] Notably, prior to his role at BorrowWorks, Gatzke was the founding Chief Technology Officer at Think Finance.[12]

### iii.     Gatzke Orchestrates Restructuring of the Lending Operation to Better Insulate Non-Tribal Schemers, Create the Façade of Tribal Control

45.     Around this same time, Gatzke orchestrated a reconfiguration of the Tribe's lending operation to eliminate many of the various service providers with which the Tribe had previously worked, to consolidate power in Gatzke and BorrowWorks, and to simultaneously attempt to insulate the Gatzke Defendants, the Lenders, and other non-tribal outsiders through an intentionally opaque corporate and management structure which was designed to obfuscate the reality of the Tribe's entirely superficial role in the lending business.

46.     Specifically, in 2017, the Tribe established ANF, which, to this day, operates as Bright Lending. ANF purportedly owns and operates the Bright Lending website.[13]

---

[9] *See* The United States Attorney's Office, Southern District of New York, *Scott Tucker Sentenced To More than 16 Years In Prison For Running $3.5 Billion Unlawful Internet Payday Lending Enterprise*, https://www.justice.gov/usao-sdny/pr/scott-tucker-sentenced-more-16-years-prison-running-35-billion-unlawful-internet-payday (last visited Nov. 8, 2024).

[10] *Id.*

[11] Consumer Financial Protection Bureau, *CFPB Sues Think Finance For Collecting On Debts That Consumers Did Not Legally Owe*, https://www.consumerfinance.gov/about-us/newsroom/cfpb-sues-think-finance-collecting-debts-consumers-did-not-legally-owe/ (last visited Nov. 8, 2024).

[12] BorrowWorks, *Meet our Leadership*, https://borrwworks.com/leadership/ (last visited Nov. 8, 2024).

[13] BorrowWorks, https://brightlending.com/ (last visited Nov. 8, 2024).

47.     However, ANF is a shell: it has no board, and no employees. The IMDG Board serves as the board of ANF, and any ANF employees are leased from IMDG. ANF does not retain any of the profits from its lending.

48.     ANF's sole member and owner is GVA Holdings, LLC ("GVA"), which is also a shell. GVA has no employees and no management. GVA's sole member and owner is IMDG. When the Tribe established GVA in 2011, it explicitly named in the GVA Articles of Operation that GVA's manager was a non-tribal outsider, Dater Portfolio Management LLC ("Dater"). (*See* Exhibit 3, ¶ 1.8.)

49.     In 2017, the Tribe established yet another tribal entity, Aaniih Nakoda Services ("ANS"), which serves as ANF's "service provider." ANS, too, is a shell. It has no employees and no management. ANS's sole member and owner is IMDG.

50.     This confusing web of supposed tribal subsidiaries—none of which have *ever* had any employees[14]— serves no practical purpose other than to obscure the continued involvement of the Gatzke Defendants, the Lenders, and other non-tribal outsiders in the Bright Lending enterprise.

51.     But these non-tribal schemers remain in control, even if their identities and their roles in the Bright Lending operation are perhaps now better hidden.

52.     Critically, ANF was established in a way to allow the entity to be managed by a non-tribal outsider, *and* to conceal the identity of its true manager.

53.     Per its Articles of Operation, ANF's "daily Business and affairs" are managed by "the Manager," which is defined as IMDG "***and/or the agent, entity or individual authorized***" by

---

[14] *See Ransom v. GreatPlains Fin., LLC*, 2024 WL 228432, at *4 (D.N.J. Jan. 22, 2024) (explaining that IMDG corporate witness testified that "none of the lending subsidiaries have ever had any employees").

GVA and the Manager to act as ANF's Manager. (Exhibit 4, ¶ 1.8) (emphasis added.) In other words—and, as discovery will show, at the direction of the Gatzke Defendants, the Lenders, and/or other non-tribal outsiders—the Tribe set up ANF so that it could be managed by IMDG, a purported tribal entity, *or effectively anyone else*. This is a far cry from the 2011 GVA Articles of Operation, which explicitly named GVA's non-tribal manager, Dater. Clearly, by 2017, the Gatzke Defendants and Lenders had learned to better cover their tracks to obscure their role in the Tribe's lending operation.

54.     As alleged further herein, ANF's daily business and affairs—i.e., the Bright Lending business—have indeed been run not by IMDG, but instead by non-tribal outsiders.

55.     In pressuring and directing the Tribal Defendants (i.e., the CEO of IMDG and the current members of the IMDG Board) to authorize outsiders to manage ANF, the Gatzke Defendants and Lenders have used the Tribe to fabricate a veneer of sovereign immunity and legitimacy for what is truly their predatory lending business. And—further illustrating that the Tribe is not in control of what is supposedly a tribal lending operation—the Gatzke Defendants and Lenders have made tremendous efforts to hide the details of their business, including their financing arrangements, *even from the Tribe*.

### iv.  Despite Claims of Tribal Ownership, Recent Filings in Other Litigation Reveal that the Lenders, Gatzke Defendants, and a Non-Tribal Professional Management Team Control Bright Lending

56.     Although the Tribe maintains that it owns and manages its online lending operation, the reality is that the Bright Lending enterprise is run by non-tribal schemers, including the Gatzke Defendants and Lenders.

57.     In recent court filings in another lawsuit, and in trying to demonstrate the Tribe's control over Bright Lending, ANF maintained that "the Tribe provided the majority of ANF's

initial capitalization through IMDG," and that the only loan from a third-party to fund the remainder has been paid in full. (*See* Exhibit 5 at 9-10.) ANF further claims that "[a]t no point did that third-party or any other lender or vender [*sic*] acquire or hold any ownership interest in ANF." (*Id.* at 10.)

58.     This may be true of *ANF*, which, again, is nothing more than a shell. However, *IMDG* is highly indebted to powerful third-party financial backers, including the Lenders.

59.     That IMDG has significant debts to non-tribal lenders cannot be disputed. In 2023, former and then-current members of the Council filed a lawsuit alleging that IMDG's former legal counsel, Jennifer Weddle and her law firm Greenberg Traurig LLP, had attempted to prevent the Council from replacing the IMDG Board (the "*Weddle* Action"). Per that lawsuit, IMDG has multiple "third-party lenders." (*See* generally Exhibit 6.) These include Newport Funding and at least one other unnamed Lender.

60.     As further alleged by plaintiffs in the *Weddle* Action, after the Council replaced the IMDG Board, Weddle double-crossed her client, IMDG, by asking the Lenders to issue a default against IMDG and attempting to transfer all of the assets of the Tribe's entities to another tribe in South Dakota. (*See generally id.*)

61.     Ultimately, the *Weddle* Action was voluntarily dismissed. Still, the filings in that action, along with others, reveal several important and shocking details points about the Bright Lending enterprise, and who truly controls it.

62.     <u>First</u>, as discussed, despite ANF's attempts to purport in court filings that it has no debt to non-tribal outsiders, IMDG is clearly, and heavily, indebted to third-party lenders.

63.     <u>Second</u>, given federal regulators' crack-down on tribal lending schemes, these Lenders now appreciate that they must carefully conceal their role in the Bright Lending operation.

12

64. For instance, in defendants' answer in the *Weddle* Action, the names of the Lenders—and, in one instance, even the name of the Lenders' legal counsel—have been redacted.

65. Third, the Lenders have gone to Herculean lengths to shield their identities and the details of their arrangements with IMDG even from the Tribe itself.

66. According to plaintiffs in the *Weddle* Action, the prior IMDG Board persistently refused to provide the Council with "financial information…regarding [IMDG's] business activities and its financing arrangements with the Lenders." (*Id.*, ¶ 57; *see also* Exhibit 7 at 3 ("The Tribal Council became increasingly concerned…after the IMDG Board persisted in refusing to provide financial information about the transactions with Lenders and IMDG's business activities.").) As the plaintiffs—all former and then-current members of the Council—pointed out, the IMDG Board's failure to provide the Council with IMDG's agreements with the Lenders was especially egregious given that *the Council owns IMDG*. (*See, e.g., id.* at 11 (alleging that defendants wrongfully "with[e]ld[] IMDG's agreements with the Lenders and other relevant information requested by the Tribal Council, the owners of IMDG").)

67. Fourth, in recent years, the Council has been concerned "significant unexplained debts and losses of revenue, and evidence of other potentially serious improprieties at IMDG." (Exhibit 6, ¶ 69.)

68. Notably, in 2022, when the Council first was investigating IMDG's finances, IMDG reported having revenue of nearly **$247 million**.[15] IMDG has claimed that 20% of its net income is distributed directly to the Tribe, with the other 80% being "reinvested" in tribal businesses or spent on projects "to benefit tribal members." (*See* Exhibit 2, ¶¶ 6-7.) As an example

---

[15] Island Mountain Development Group, *2022 Annual Report* at 4, https://www.islandmtn.com/wp-content/uploads/2024/06/IMDG-2022-Annual-Report.pdf (last visited Nov. 8, 2024).

of the latter, the former IMDG CEO touted a $2.575 million tribal member housing development. (*Id.*, ¶ 7.)

69.     But such relatively small projects cannot possibly explain the depletion of hundreds of millions of dollars in revenues, nor the "significant unexplained debts and losses" that prompted the Council's investigation. IMDG's money must be going *somewhere* other than to the Tribe. Discovery will show that much of it went to the Lenders, under arrangements to which the Council itself was not privy.

70.     Fifth, and perhaps most remarkably, the *Weddle* Action is riddled with proof that the Lenders and their hand-picked professional IMDG senior staff—not the Tribe—are in full control of the Bright Lending enterprise.

71.     In their answer, defendants asserted that they had advised IMDG and its affiliates regarding its agreements with third parties (including the Lenders), and that:

> IMDG and the [Council] repeatedly confirmed to the Lenders that IMDG's Board was validly constituted and fully empowered to take all actions with respect to the consumer lending businesses. ***In five separate Council Resolutions that were expressly incorporated into the Lenders' contracts between 2018 and 2021, the Council promised not to interfere with the IMDG Board or any Tribal entity***.

(Exhibit 8 at 2 (emphasis added).)

72.     This is a stunning admission: The Lenders' financing was conditioned on the governing body of the Tribe guaranteeing that it would not "interfere" with the consumer lending businesses of a purported tribal entity.

73.     The enormous breadth of the Lenders' resulting power is perhaps best illustrated by the facts alleged in *Weddle* Action.

74.     According to the plaintiffs' complaint, the IMDG Board refused to provide the Council—which, again, was concerned about "significant unexplained debts and losses of revenue,

and evidence of other potentially serious improprieties at IMDG," Exhibit 6, ¶ 69—with information about IMDG's financing arrangements with the Lenders. After months of requesting this information, to no avail, the Council eventually un-seated and replaced the IMDG Board.

75.     As defendants described it, in doing so, the Council—composed of officials elected to govern the Tribe—"chose to wrongfully interfere with a tribal business." (Exhibit 9 at 2.)

76.     That very night, Newport Funding, "IMDG's principal outside creditor," declared an event of default and eventually seized control of IMDG's bank accounts. (*Id.* at 3; *see also* Exhibit 10.)

77.     Another unnamed Lender wrote that restoring "IMDG stability" after the Board shakeup "is essential in protecting the Collateral which in turn also protects important Tribal assets and jobs." (Exhibit 11 at 2.)

78.     Simply put, when the Tribe—through the Council—tried to assert control over IMDG's lending operations due to the Council's legitimate concerns over unexplained debts and serious improprieties, the Lenders seized the lending enterprise's bank accounts, and threatened to bring the entire Bright Lending enterprise to a screeching halt.

79.     This illustrates that the Lenders, not the Tribe, control Bright Lending.

80.     Correspondence from the unnamed Lender includes another stunning detail: a "professional IMDG management team [] currently manages the Tribe's lending entities." (*Id.* at 5.) Not only that, but the Lenders have further conditioned their financing of the Bright Lending enterprise on the continued employment of such a team. Simply put, the Lenders have forced the Tribe to hire non-tribal outsiders to run the tribal lending operation.

81.     Again, ANF's Articles of Operation allow for any "agent, entity or individual" to manage ANF's "daily Business and affairs." (Exhibit 4, ¶ 1.8.) At the insistence of the Lenders,

the Tribe has apparently delegated this role to a professional management team of non-tribal outsiders.

82.     Until recently, for example, this team was led, at least in part, by non-tribal member Christoper Biewer, who was employed at IMDG from 2017-2023.[16] His exact role at IMDG has been described in a number of ways, including: "IMDG's General Manager of Lender Operations," Exhibit 9 at ¶ 27; the "Director [of] Online Lending," Exhibit 7 ¶ 24; and the "General Manager" of GVA.[17] While these titles may vary, they all indicate that Biewer was a senior member of the "professional IMDG management team" that "manages the Tribe's lending entities." In yet another indication of the Gatzke Defendants' intimate involvement in the Bright Lending scheme, Biewer, per his LinkedIn profile, is now employed as the Senior Vice President of Products and Strategy at BorrowWorks.

83.     Even more troubling than the fact that the Tribe's lending operation is managed by a team of non-tribal outsiders is the fact that the Lenders have effectively bullied the Tribe into this structure.

84.     In the unnamed Lender's correspondence, the Lender asked that IMDG leadership "sign a certification of the commitments made to restoring stability and protecting the Collateral." (Exhibit 11 at 2.) The *very first* certification is as follows:

> Key People Assurances. ***The IMDG Board understands that the professional IMDG management team that currently manages the Tribe's lending entities is essential in managing the assets which constitute the Collateral.*** The IMDG Board also acknowledges that (a) specialized legal counsel is essential for the operation and defense of the companies owning the pledged Collateral, (b) the legal opinions given by Greenberg Traurig as a condition to close each [REDACTED] loan remain foundational and the failure of such legal opinions to remain in good-

---

[16] LinkedIn, *Chris B.*, https://www.linkedin.com/in/chris-b-ab677465/ (last visited Nov. 8, 2024).
[17] Island Mountain Development Group, *2021 Annual Report* at 11, https://www.islandmtn.com/wp-content/uploads/2024/07/IMDG-2021-Annual-Report.pdf (last visited Nov. 8, 2024).

standing constitute an Event of Default. ***The IMDG Board hereby provides [REDACTED] written assurances that no changes in IMDG management or legal counsel will be made without prior consultation with [REDACTED]***…

(*Id.* at 5 (emphasis added).)

85.      In other words, the Lenders expect to have final say over "IMDG management," as well as IMDG's legal counsel. Again, that the Lenders exercise substantial control over Bright Lending is abundantly clear.

86.      And, that the Lenders insist on IMDG being managed by hand-picked, "professional" non-tribal outsiders, like Biewer, is also clear. Indeed, the unnamed Lender concluded its correspondence with the following: "[REDACTED] looks forward to the normalization of our relationship with IMDG and the Tribes and ***the continued professional management of the Tribe's lending assets by IMDG***." (*Id.* at 2 (emphasis added).)

87.      All told, while the Tribe may formally own IMDG, the Tribe has been forced to cede the actual control and management of IMDG, and, in turn, Bright Lending, to the Lenders, the Gatzke Defendants, and other non-tribal schemers. The Tribe and its lending operation are at the whim of these outsiders, who have the power to shut down the entire operation if the Council attempts to so much as "interfere" with the lending business—a power that the outsiders are not afraid to use.

### v.      The Gatzke Defendants' Ongoing Management Role in Bright Lending and Defendants' Attempts to Hide It

88.      In addition to the foregoing, there are various indications that the Gatzke Defendants, in particular, continue to play a hands-on role in the day-to-day execution of the Bright Lending operation. The Gatzke Defendants claim that they simply provide limited, "non-management" services to Bright Lending. This is false. Far from being a mere service provider, and despite Defendants' efforts to obscure the Gatzke Defendants' role, the Gatzke Defendants

exert significant control over the lending operation.

        **a.**    **Gatzke Helped Fund the Launch of ANF, Secured Additional Financing**

89.     Gatzke was intimately involved in the very creation of ANF. This corporate shell was launched using, in part, initial funding from Sage Capital, another Gatzke entity.

90.     In addition, the Gatzke Defendants helped IMDG secure a loan to replace funding from the other service providers with which the Tribe had ceased working.

91.     Moreover, the Gatzke Defendants have admitted in court filings that the Tribe will leverage their relationships with certain data vendors. Discovery will show that the Tribe has also leveraged the Gatzke Defendants' relationships to secure funding from the Lenders, as well.

        **b.**    **BorrowWorks Receives Profit-Based Payments from ANF**

92.     ANF readily admits that BorrowWorks receives profit-based payments from ANF.

93.     In fact, *all* of ANF's "cash profitability" that does not go to IMDG goes to BorrowWorks.

        **c.**    **The Gatzke Defendants Built and Manage the Bright Lending Website**

94.     BorrowWorks admittedly provides the so-called "technology platform" behind Bright Lending. Although the Gatzke Defendants attempt to describe themselves as nothing more than a technology vendor, the reality is that the technology they provide and manage effectively *is* the entire Bright Lending operation.

95.     The Bright Lending website, or "technology platform," is where applicants and borrowers receive marketing messaging, submit loan applications, receive loan proceeds, and make payments. It is also where loans are underwritten.

96.     BorrowWorks does not just build the technology that allows the above to occur— it sets the strategies and parameters. Indeed, BorrowWorks concedes that it "develop[s] and

maintain[s] risk assessment strategies" that can be used for credit decision underwriting, and "develop[s] advanced scoring models" for its clients.[18]

97.     The Gatzke Defendants also admit that they assist IMDG with marketing. They claim, however, that any marketing proposals must ultimately be approved by Bright Lending. But, as discussed above, because ANF is managed day-to-day by an outside professional management team, all this means is that *non-tribal outsiders*—who, again, are hand-picked by the Lenders—must approve the Gatzke Defendants' marketing proposals. In sum, the marketing for Bright Lending can be, and is, determined entirely by non-tribal outsiders.

98.     Further confirming that the Gatzke Defendants are much more than a technology vendor, BorrowWorks has previously touted that it offers "***full service portfolio management***" for its clients, which includes "[d]ecision science, loan servicing and marketing."[19] This is the case here, with the Gatzke Defendants providing much more than just the "technology platform" for Bright Lending.

99.     Lastly, there are indications that Defendants have taken numerous steps to hide the Gatzke Defendants' role in the Bright Lending website.

100.     In at least 2017 and 2018, that website was registered to Gatzke, using a BorrowWorks email address. (*See* Exhibit 12 at 2; *id.* at 4.) Yet today, the Bright Lending website is now registered to "Domains by Proxy, LLC" (*see* Exhibit 13 at 2), a service used specifically to hide the true individual or entity behind a website.

101.     But, perhaps even more suspicious is the fact that brightlending.com has been

---

[18] *See* BorrowWorks, https://borrowworks.com/solutions/ (last visited Oct. 28, 2024).
[19]   BorrowWorks (digital archive from Wayback Machine, dated Sept. 12, 2017), https://web.archive.org/web/20170912005424/http://borrowworks.com/ (emphasis added) (last visited Nov. 8, 2024).

*entirely excluded* from the popular digital archive, the Wayback Machine. (*See* Exhibit 14.) This means that someone affirmatively requested that the Wayback Machine stop archiving the Bright Lending website. And it means that prior iterations of any pages of the website—which perhaps included more evidence of the Gatzke Defendants' and other non-tribal outsiders' involvement in the lending operation—cannot be recovered.

vi.  **All Told, the Lenders, Gatzke Defendants, and Other Non-Tribal Outsiders are at the Helm of Bright Lending**

102.    Since at least 2011, and with even more force since 2017, the Tribal Defendants have been coerced into allowing non-tribal outsiders to wield the Tribe's name in an attempt to shield from liability these non-tribal outsiders and the predatory lending businesses that they run.

103.    But, despite providing cover for the illegal lending enterprise, the Tribe does not meaningfully participate in the day-to-day lending operations of its purported affiliates and subsidiaries. Rather, the Lenders, the Gatzke Defendants, and other non-tribal schemers exercise control of the illegal lending enterprise by, *inter alia*:

- Developing and directing the corporate design of the scheme, including the creation of numerous shell tribal entities;

- Providing funds to finance the loans and other activities of the lending scheme;

- Conditioning the provision of such funds on the Tribe's promise not to "interfere" with the lending operation;

- Further conditioning the provision of such funds on the lending operation being managed day-to-day by a team of non-tribal professionals, who cannot be replaced absent the schemers' approval;

- Registering the website domain for Bright Lending;

- Creating website content that claims an illegitimate tribal affiliation and engaging

in marketing activities, including communicating with consumers urging them to take out loans or additional loans;

- Developing underwriting criteria for lending;

- Creating and overseeing the "technology platform" that services and administers the loans; and

- Repaying investors in the lending schemes.

104. The Lenders, in particular, exert significant control over the Tribe's lending business by, for example, conditioning their financing on the Council promising not to "interfere" with the business, and on that business being managed by their hand-picked professional, and non-tribal, management team, including individuals like Biewer. Through this arrangement, the Lenders effectively control the day-to-day business operations of the scheme.

105. Moreover, Gatzke initially registered the website domain for the Bright Lending electronic storefront, and the Gatzke Defendants create the marketing content that claims an illegitimate tribal affiliation. It is through this website that the Gatzke Defendants, the Lenders, and their employees, subsidiaries, and affiliates advertise their consumer loans and promote their illegitimate tribal identity.

106. Further, through the Bright Lending website, and exactly as BorrowWorks advertises, the Gatzke Defendants, and their employees, subsidiaries, and affiliates, perform the underwriting of the loans issued by Bright Lending, and also develop and maintain the strategies to be used for such underwriting.

107. The Gatzke Defendants, and their employees, subsidiaries, and affiliates, also issue and administer the loans, through the Bright Lending website, which is where borrowers, *inter alia*, submit loan applications, receive loan proceeds, and make payments.

21

108.    The Lenders and the Gatzke Defendants, and their employees, subsidiaries, and affiliates, also provide or facilitate the funds to finance the loans and other activities of the lending scheme, and then use the money that they extract from consumers to repay the scheme's investors.

109.    The majority of the profits made by Bright Lending did not and do not flow to the Tribe. Instead, discovery will show that the majority of the profits flow to non-tribal outsiders, including the Lenders and Gatzke Defendants.

110.    In addition to feigning sovereign immunity in an attempt to insulate themselves from liability, Bright Lending is not licensed to lend in the states in which it is lending, and is lending at interest rates that are illegal in many states. The only license that Bright Lending purports to have is one issued by the Tribe.[20]

111.    Defendants offered and continue to offer short-term loans with exorbitant finance charges and triple-digit interest rates. Because of the high interest rates attached to these loans, the finance charges that consumers pay often quickly exceed the amount borrowed. Although consumers would ideally rarely, if ever, need to take out a small sum, short-term loan with a high interest rate, consumers often find themselves in a destructive feedback loop wherein they are forced to take out a series of these loans to make ends meet and/or to pay off prior loans, losing thousands of dollars to exorbitant finance charges in the process.

112.    Under the terms of Bright Lending's loan agreements, Defendants lent borrowers small sums of money and charged annual interest rates in the high triple digits—rates invariably exceeding 600%. As a result of these exorbitant finance charges, Plaintiff and others have ended up owing, and paying, many times the amount of money that they initially borrowed.

---

[20] Bright Lending, *Why Bright Lending*, https://brightlending.com/ (last visited Nov. 1, 2024) ("Bright Lending is a licensed lender authorized by the Tribe's Tribal Regulatory Authority.").

113.    The interest rates that Defendants charged under these loan agreements are many times the caps imposed by state law in a number of jurisdictions, including the state in which Plaintiff resides.

**C.    Plaintiff's Loans with Bright Lending**

114.    From his residence in Chicago, Illinois, Plaintiff applied for and took out a loan with Bright Lending over the internet in September 2022. At the time he took out the loan, Plaintiff believed that Bright Lending was operating lawfully and lending at rates that complied with the law.

115.    Plaintiff's first loan from Bright Lending was for $1,250 and had an interest rate of 598.5461%. According to the loan agreement, the finances charges on the loan were $6,480.25. Excepting the final payment, the bi-weekly payment on the loan was $308.40. If Plaintiff had made all of the payments on his loan according to the payment schedule, he would have ended up paying Defendants $7,730.25 for his $1,250 loan—more than six times what he borrowed. Plaintiff made eight payments of $308.40, before opting to pay the remaining balance, in the amount of $1,385.72, in full. All told, Plaintiff made a total of $3,852.92 in payments to Defendants—more than three times what he borrowed.

116.    From his residence in Chicago, Illinois, Plaintiff applied for and took out a second loan with Bright Lending over the internet in December 2023. At the time he took out the loan, Plaintiff believed that Bright Lending was operating lawfully and lending at rates that complied with the law.

117.    Plaintiff's second loan from Bright Lending was for $1,250 and had an interest rate of 499.9993%. According to the loan agreement, the finances charges on the loan were $5,085.23. Excepting the final payment, the bi-weekly payment on the loan was $253.41. If Plaintiff had made

all of the payments on his loan according to the payment schedule, he would have ended up paying Defendants $6,335.23 for his $1,250 loan—more than five times what he borrowed. Plaintiff paid $1,008.23 for this loan before he ceased making payments once he learned that his loan with Bright Lending is usurious.

### D. Illinois Prohibitions on Predatory, Unlicensed Lenders

118.    The Illinois Predatory Loan Prevention Act makes it unlawful for a lender to "contract for or receive charges exceeding a 36% annual percentage rate on the unpaid balance of the amount financed for a loan." 815 ILCS 123/15-5-5.

119.    "Any loan made in violation of this Act is null and void and no person or entity shall have any right to collect, attempt to collect, receive, or retain any principal, fee, interest, or charges related to the loan." 815 ILCS 123/15-5-10.

120.    Moreover, "[a]ny violation of this Act…constitutes a violation of the Consumer Fraud and Deceptive Business Practices Act." 815 ILCS 123/15-10-5(b).

### CLASS ACTION ALLEGATIONS

121.    Plaintiff asserts claims on behalf of the proposed National Class defined as follows:

All United States residents who entered into loan agreements with Bright Lending or other lending affiliates of the Fort Belknap Indian Community within the applicable statute of limitations. This Class does not include loans that were taken out while a consumer was located in Utah, Nevada, or Alabama.

122.    Plaintiff asserts claims on behalf of the proposed Illinois Class defined as follows:

All Illinois residents who entered into loan agreements with Bright Lending or other lending affiliates or of the Fort Belknap Indian Community within the applicable statute of limitations.

### A.    Numerosity

123.    There are hundreds or thousands of members of the Classes. Thus, the Classes are so numerous that joinder of all members is impracticable.

**B.    Commonality**

124.    There are numerous common questions of law and fact common to Plaintiff and the members of the Classes. These questions include, but are not limited to, the following:

      a.    Whether Defendants violated state usury and consumer protection laws;

      b.    Whether Defendants are protected by tribal sovereign immunity;

      c.    Whether Defendants constitute an "enterprise" under RICO;

      d.    Whether Defendants violated RICO by charging interest rates more than twice the legal limit under state law;

      e.    The scope of any prospective relief; and

      f.    The proper measure and amount of damages for the Classes.

**C.    Typicality**

125.    Plaintiff's claims are typical of the claims of the Classes he seeks to represent. Plaintiff, like members of the Classes, took out usurious loans from Defendants. Thus, Plaintiff's claims, like the claims of the Classes, arise out of the same common practices and conduct by Defendants and are based on the same legal and remedial theories.

**D.    Adequacy**

126.    Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff has competent and capable attorneys who are experienced trial lawyers with significant experience litigating complex class actions, including experience litigating tribal lending cases. Plaintiff and his counsel are committed to prosecuting this action vigorously on behalf of the Classes and have the financial resources to do so. Neither Plaintiff nor his counsel have interests that conflict with those of the Classes.

**E.    Injunctive Relief**

127.    The Classes meet the requirements for certification to obtain injunctive or equitable relief under Fed. R. Civ. P. 23(b)(2), as Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive or equitable relief with respect to the Classes as a whole. Prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications with respect to individual members of the Classes that would establish incompatible standards of conduct for Defendants.

**F.    Predominance and Superiority**

128.    The Classes meet the requirements for certification to seek monetary relief under Federal Rule of Civil Procedure 23(b)(3), as the questions of law or fact common to class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. Additionally, individual actions may be dispositive of the interests of members of the Classes even though certain members of the Classes are not parties to such actions. Further, a class action is superior to other available methods for the fair and efficient adjudication of the controversy for at least the following reasons:

a.    Absent a class action, as a practical matter, members of the Classes will be unable to obtain redress, Defendants' violations will continue without remedy, and additional consumers will be harmed.

b.    It would be a substantial hardship for most individual members of the Classes if they were forced to prosecute individual actions.

c.    A class action will permit an orderly and expeditious administration of class claims and foster economies of time, effort, and expense.

d.    The lawsuit presents no difficulties that would impede its management by

the Court as a class action.

        e.      Defendants have acted on grounds generally applicable to class members, making class-wide relief appropriate.

### CAUSES OF ACTION
### FIRST CAUSE OF ACTION
**Violation of RICO, 18 U.S.C. § 1962(c)**
**(On Behalf of Plaintiff and the National Class)**
**(Class Claims against the Gatzke Defendants and Lenders)**

129. Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

130. Each Gatzke Defendant and Lender is a "person" as that term is defined in 18 U.S.C. § 1964(3).

131. The Enterprise, consisting of each of the named Gatzke Defendants, the Lenders, the Tribal Defendants, and the unnamed officers, executives, and other employees of Bright Lending and other lending affiliates or subsidiaries of the Tribe involved in the scheme, is in association as an "enterprise" as that term is defined in 18 U.S.C. § 1961(4). The Enterprise associated for the common purpose of profiting off of the collection on unlawful debt by offering and collecting on loans to consumers throughout the United States through online lenders affiliated with the Gatzke Defendants and Lenders.

132. The Enterprise has an ongoing organization with an ascertainable structure, and functions as a continuing unit with separate roles and responsibilities.

133. The Gatzke Defendants, for example: developed and directed the corporate design of the Enterprise, including the creation of numerous shell tribal entities; provided funds to launch the Enterprise and secured additional funders to finance the loans and other activities of the Enterprise; registered the website domain for Bright Lending; developed the Bright Lending

mobile app; developed and now manage the "technology platform" that advertises, services, and administers Bright Lending loans; develops the underwriting criteria for lending; creates website content and otherwise engages in marketing activities for the Enterprise, including communicating with consumers urging them to take out loans or additional loans.

134.    Meanwhile, the Lenders, for example: provide funds to finance the loans and other activities of the lending scheme; exert control over the Enterprise's management team and legal counsel to insist on the Tribe's promise not to "interfere" with the lending operation; and repay investors in the lending schemes.

135.    Finally, the Tribal Defendants provide the laundered sovereign immunity for the Enterprise, having acquiesced to pressure from the Gatzke Defendants and Lenders to set up the scheme that they had developed, and to cede the necessary control to non-tribal outsiders to execute it. In return, the Tribal Defendants accept a small portion of the Enterprise's profits.

136.    The Gatzke Defendants and Lenders have violated § 1962(c) of RICO by participating, directly or indirectly, in the conduct of the Enterprise's affairs in the collection of unlawful debt.

137.    RICO defines "unlawful debt" as a debt which was "unenforceable under State law in whole or in part as to principal or interest because of the laws relating to usury," and was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

138.    All of the loans made to the National Class members and collected by the Gatzke Defendants and Lenders included an interest rate far in excess of twice the enforceable rate in their respective states.

139.    The Gatzke Defendants and Lenders charged Plaintiff an interest rate in excess of the maximum rate allowed in his state knowingly, deliberately, intentionally, and willfully, with the purpose of taking more than twice the legal rate of interest for the money loaned to Plaintiff.

140.    The Gatzke Defendants' and Lenders' conduct was not the result of good-faith error, but instead was a knowing, deliberate, intentional, and willful scheme to circumvent laws in Plaintiff's state, and to collect interest at rates more than twice that allowed under that state's laws.

141.    Plaintiff and the National Class members were injured as a result of the Gatzke Defendants' and Lenders' violations of 18 U.S.C. § 1962(c) by, among other things, the payment of unlawful and usurious rates of interest on loans made by the Enterprise.

142.    This conduct continues to date, and will be repeated again and again in the future, to the detriment of consumers.

143.    Accordingly, the Gatzke Defendants and Lenders are jointly and severally liable to Plaintiff and the National Class members for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**SECOND CAUSE OF ACTION**
**Violation of RICO, 18 U.S.C. § 1962(d)**
**(On Behalf of Plaintiff and the National Class)**
**(Class Claims against the Gatzke Defendants and Lenders)**

144.    Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

145.    Each Gatzke Defendant and Lender is a "person" as that term is defined in 18 U.S.C. § 1964(3).

146.    The Enterprise, consisting of each of the named Gatzke Defendants, the Lenders, the Tribal Defendants, and the unnamed officers, executives, and other employees of Bright Lending and other lending affiliates or subsidiaries of the Tribe involved in the scheme, is in

association as an "enterprise" as that term is defined in 18 U.S.C. § 1961(4). The Enterprise associated for the common purpose of profiting off of the collection on unlawful debt by offering and collecting on loans to consumers throughout the United States through online lenders affiliated with the Gatzke Defendants and Lenders.

147. The Enterprise has an ongoing organization with an ascertainable structure, and functioned as a continuing unit with separate roles and responsibilities.

148. The Gatzke Defendants and Lenders have violated 18 U.S.C. § 1962(d) by conspiring to use the Enterprise to collect unlawful debt. Each Gatzke Defendant and Lender knowingly agreed to participate in the scheme alleged herein that allowed the Enterprise to make and collect unlawful debt at more than twice the lawful rate of interest under state usury laws.

149. This conduct continues to date, and will be repeated again and again in the future, to the detriment of consumers.

150. Accordingly, the Gatzke Defendants and Lenders are jointly and severally liable to Plaintiff and the National Class members for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

**THIRD CAUSE OF ACTION**
**Violations of the Illinois Predatory Loan Prevention Action and Illinois Consumer Fraud**
**and Deceptive Business Practices Act**
**(On Behalf of Plaintiff and the Illinois Class)**
**(Class Claims against the Gatzke Defendants and Lenders)**

151. Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

152. All of the loans made to Plaintiff and Illinois consumers in the name of Bright Lending and/or other lending affiliates or subsidiaries of the Tribe carried an annual interest rate well in excess of 36%, in violation of the Predatory Loan Prevention Act. 815 ILCS 123/15-5-5.

153.    A violation of the Predatory Loan Prevention Act is a violation of the Illinois Consumer Fraud Act and Deceptive Business Practices Act. 815 ILCS 123/15-10-5(b).

154.    Accordingly, Plaintiff and members of the Illinois Class are entitled to recover all actual damages, in the form of interest paid on the loans in excess of 36%, plus their reasonable attorneys' fees and costs, and injunctive relief. 815 ILCS 505/10a(a), (c).

**FOURTH CAUSE OF ACTION**
**Unjust Enrichment**
**(On Behalf of Plaintiff and the National Class)**
**(Class Claims against the Gatzke Defendants and Lenders)**

155.    To the detriment of Plaintiff and members of the National Class, the Gatzke Defendants and Lenders have been, and continue to be, unjustly enriched as a result of charging and collecting illegal, usurious interest rates from Plaintiff and members of the National Class.

156.    As between the parties, it would be unjust for the Gatzke Defendants and Lenders to retain the benefits attained by their actions. Accordingly, on behalf of himself and members of the National Class, Plaintiff seeks a full accounting and restitution of the Gatzke Defendants' and Lenders' enrichment, benefits, and ill-gotten gains acquired as a result of the unlawful conduct alleged herein.

**FIFTH CAUSE OF ACTION**
**Civil Conspiracy**
**(On Behalf of Plaintiff and the National Class)**
**(Class Claims against the Gatzke Defendants and Lenders)**

157.    All of the loans that the Gatzke Defendants made to consumers in the name of Bright Lending and/or other lending affiliates or subsidiaries of the FBIC violated Plaintiff's and the National Class members' respective states' interest rates and lending laws.

158.    The Gatzke Defendants and Lenders conspired amongst themselves and with other actors to violate state usury and lending laws and profit from those violations.

159.     Accordingly, on behalf of himself and the members of the National Class, Plaintiff seeks to recover from the Gatzke Defendants and Lenders, jointly and severally, all amounts repaid on any loans with the Gatzke Defendants and Lenders.

**SIXTH CAUSE OF ACTION**
**Declaratory Judgment, 28 U.S.C. § 2201**
**(On Behalf of Plaintiff and the Illinois Class)**
**(Class Claims against the Tribal Defendants in their official capacities)**

160.     Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

161.     Illinois—along with many other states—requires that those who engage in the business of making small loans be licensed.

162.     Defendants were not licensed to make loans in Illinois or any other state.

163.     Because Defendants' loans were made without the required license and/or charged excessive interest rates, those loans are void in Illinois.

164.     In addition to violating state licensing laws, Defendants' loans also violated the general usury laws of many states, including Illinois.

165.     Further, the lending agreements used for Plaintiff's and Illinois Class members' loans contained unconscionable choice-of-law and forum-selection provisions that are void and unenforceable.

166.     Because of the triple-digit interest rates, Plaintiff and certain Illinois Class members with unpaid balances are subject to significant liability as the interest accrues on their unpaid debts.

167.     Resolution of the validity and enforceability of the outstanding balance on Plaintiff's loan agreement by this Court will determine the rights and interests of the parties to their respective agreements.

168.     Thus, the validity and enforceability of Plaintiff's loan agreement, including, but

32

not limited to, any outstanding balance, presents a substantial, non-speculative controversy between parties with adverse legal interests of sufficient immediacy and reality.

169.     Accordingly, Plaintiff, on behalf of himself and the members of the Illinois Class, seeks a determination that his loans and those of the Illinois Class members are void and unenforceable, and that Plaintiff and the Illinois Class members are not obligated to pay any principal and/or interest outstanding on the illegal loans under their respective state laws.

**SEVENTH CAUSE OF ACTION**
**Violations of State Law**
**(On Behalf of Plaintiff and the Illinois Class)**
**(Class Claims against the Tribal Defendants in their official capacities for prospective relief)**

170.     Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

171.     As alleged herein, Plaintiff and other consumers in Illinois applied for and took out loans with Bright Lending and other entities affiliated with the FBIC, which they maintain are void and unenforceable because they violate state laws.

172.     Plaintiff and members of the Illinois Class have outstanding balances on their loans with Bright Lending and other entities affiliated with the FBIC.

173.     Because of the usurious interest rates charged by Bright Lending and other entities affiliated with the FBIC, Plaintiff and other consumers in Illinois are subject to significant liability as the interest accrues on their unpaid debts.

174.     Accordingly, Plaintiff, on behalf of himself and the Illinois Class, seeks injunctive relief from the Tribal Defendants, including, but not limited to, an order: (i) prohibiting the Tribal Defendants from continuing to collect on the illegal loans in Illinois; (ii) requiring the Tribal Defendants to send notices to Illinois consumers explaining that their loans are illegal and

usurious; and (iii) prohibiting the Tribal Defendants from selling the unlawful loans to consumers in Illinois to third-party debt collectors.

175.     Plaintiff, on behalf of himself and all others similarly situated, further seeks a determination that he and the Illinois Class members are not obligated to pay any principal and/or interest outstanding on the illegal loans.

**EIGHTH CAUSE OF ACTION**
**Violation of RICO, 18 U.S.C. § 1962(c)-(d)**
**(On Behalf of Plaintiff and the National Class)**
**(Class Claims against the Tribal Defendants in their official capacities)**

176.     Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

177.     The Tribal Defendants are each being sued in their official capacities as members of the IMDG Board and/or as officers of IMDG.

178.     Each of the Tribal Defendants is a "person" as that term is defined in 18 U.S.C. § 1964(3).

179.     The Enterprise, consisting of the Tribal Defendants, the Gatzke Defendants, the Lenders, and the unnamed officers, executives, and other employees of Bright Lending and other lending affiliates or subsidiaries of the Tribe involved in the scheme, is an "enterprise," as that term is defined in 18 U.S.C. § 1961(4), associated for the common purpose of profiting off of the collection on unlawful debt by offering and collecting on loans to consumers throughout the United States.

180.     The Enterprise has an ongoing organization with an ascertainable structure, and it functions as a continuing unit with separate roles and responsibilities.

181.     The Tribal Defendants violated and continue to violate 18 U.S.C. § 1962(c) of RICO by participating, directly or indirectly, in the conduct of the Enterprise's affairs by

authorizing the Gatzke Defendants and Lenders to enter agreements with consumers throughout the United States that are illegal under state law on behalf of tribal entities and purportedly under tribal law, and by collecting the resulting unlawful debt.

182.    RICO defines "unlawful debt" as a debt which was "unenforceable under State law in whole or in part as to principal or interest because of the laws relating to usury," and was uncured in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

183.    All of the loans made to class members and collected by the Enterprise and others, included interest rates far in excess of twice the enforceable rate in the class members' states.

184.    Plaintiff and class members were injured as a direct result of the Tribal Defendants' violations of 18 U.S.C. § 1962(c), by, among other things, the payment of unlawful and usurious rates of interest on loans made by the Enterprise.

185.    This conduct began at the latest in 2017, continues to date, and will be repeated again and again in the future to the detriment of consumers nationwide.

186.    The Tribal Defendants also violated 18 U.S.C. § 1962(d) by conspiring to use the Enterprise to collect unlawful debt. Each of the Tribal Defendants knowingly and willfully agreed to participate in the scheme alleged herein that allowed the Enterprise to make and collect unlawful debt at more than twice the lawful rate of interest under state usury laws.

187.    Plaintiff and the class members were injured as a direct result of the Tribal Defendants' violations of 18 U.S.C. § 1962(d) by, among other thing, the payment of unlawful and usurious rates of interest on loans made by the Enterprise.

188.    This conduct began at the latest in 2017, continues to date, and will be repeated again and again in the future to the detriment of consumers nationwide.

189.     The Tribal Defendants participated and continue to participate in the collection of the unlawful debt by aiding, abetting, and procuring proceeds from the Enterprise, and willfully investing money in the Enterprise for the purpose of the unlawful scheme.

190.     Plaintiff seeks prospective injunctive and declaratory relief for the Tribal Defendants' conduct, including an order: (1) barring the Tribal Defendants from continuing to make loans to consumers that exceed the legal interest rates for consumers residing in each state; (2) prohibiting the Tribal Defendants from continuing to collect on the unlawful loans; (3) requiring the Tribal Defendants to ensure that all accounts are deleted from consumers' credit reports; and (4) requiring the Tribal Defendants to send notice to consumers explaining that their loans are void and unenforceable.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief as follows:

A.     An Order certifying the proposed Classes under Fed. R. Civ. P. 23(b)(2) and (b)(3), and appointing Plaintiff as Class Representative and his counsel as Class Counsel;

B.     An Order declaring that Defendants are financially responsible for notifying members of the Classes of the pendency of this suit;

C.     An Order declaring that Defendants have committed the violations of law alleged herein;

D.     An Order providing for any and all injunctive relief the Court deems appropriate;

E.     An Order awarding monetary damages, including, but not limited to, any compensatory, incidental, or consequential damages in an amount to be determined by the Court or jury;

F.     An Order awarding treble damages in accordance with proof and in an amount

consistent with applicable precedent;

      G.    An Order awarding interest at the maximum allowable legal rate on the foregoing sums;

      H.    An Order awarding Plaintiff his reasonable costs and expenses of suit, including attorneys' fees; and

      I.    Such further relief as this Court may deem just and proper.

### <u>DEMAND FOR JURY TRIAL</u>

Plaintiff respectfully demands a trial by jury pursuant to Fed. R. Civ. P. 38(b).

Dated: November 18, 2024            Respectfully submitted,

           /s/ Richard Schwartz
           Richard Schwartz (ARDC# 6323474)
           **BERGER MONTAGUE PC**
           1720 W. Division St.
           Chicago, IL 60622
           Tel: (773) 257-0255
           rschwartz@bm.net

           John G. Albanese*
           Marika O'Connor Grant*
           Ariana B. Kiener*
           **BERGER MONTAGUE PC**
           1229 Tyler Street NE, Suite 205
           Minneapolis, MN 55413
           Tel : (612) 594-5999
           Fax : (612) 584-4470
           jalbanese@bm.net
           moconnorgrant@bm.net
           akiener@bm.net

           *to be admitted *pro hac vice*

           *Attorneys for Plaintiff*