**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CURTIS DIXON, on behalf of himself and all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No. 24 C 11834 |
| BENJAMIN E. GATZKE; BORROWWORKS DECISION SCIENCE, INC.; BWDS, LLC; NEWPORT FUNDING, LLC; TAYLOR McCABE; WILLIAM BELL; ALAN BIGBY; KATHLEEN ADAMS; TICIA CLIFF; FAWN WILLIAMSON; FRANK DONEY; and JOHN DOES 1–40, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

MATTHEW F. KENNELLY, District Judge:

Curtis Dixon, on behalf of himself and others similarly situated, has filed suit against Benjamin Gatzke and his companies, BorrowWorks Decision Science, Inc., and BWDS, LLC (collectively the Gatzke Defendants); Newport Funding; Taylor McCabe, William Bell, Alan Bigby, Kathleen Adams, Ticia Cliff, Fawn Williamson, and Frank Doney (collectively the Tribal Defendants); and various "John Doe" defendants. Dixon alleges that the Gatzke Defendants and Newport Funding have violated the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962 (Counts 1 and 2), as well as the Illinois Predatory Loan Prevention Act (PLPA), 815 ILCS 123/15-5-5, and the Illinois Consumer Fraud and Deceptive Business Practices Act (ICFA), 815 ILCS 505/10a (Count 3). Dixon further asserts claims against the Gatzke Defendants and Newport Funding for unjust enrichment (Count 4) and civil conspiracy (Count 5). Dixon

also alleges that the Tribal Defendants have violated RICO (Count 8), and he seeks injunctive relief under Illinois state laws (Count 7) and declaratory relief under the Declaratory Judgment Act, 28 U.S.C. § 2201 (Count 6).

Defendants have moved to dismiss, with each group filing a separate motion and adopting certain aspects of other defendants' briefs. Collectively, the defendants contend that dismissal is warranted under Federal Rules of Civil Procedure 12(b)(2), 12(b)(6), and 12(b)(7). For the reasons set forth below, the Court grants Newport Funding's motion to dismiss under Rule 12(b)(2) for lack of personal jurisdiction but otherwise denies all other aspects of defendants' motions.

## Background

The following background is taken from Dixon's complaint, exhibits attached to the complaint, and affidavits attached to the parties' motions. This case arises from two high-interest loans that Dixon obtained through a tribal lending operation. Dixon contends that the Fort Belknap Indian Community of the Fort Belknap Reservation of Montana (the Tribe) has entered into agreements with various third parties "to lend the Tribe's name to predatory lending operations" and that "[i]n exchange, the Tribe receives a small portion of these businesses' revenues." Compl. ¶ 6.

Dixon alleges that the tribal lending scheme operates through numerous entities established under tribal law that work in conjunction with—or perhaps at the direction of—third parties. The Tribe's constitution authorizes the Tribal Council, as the Tribe's governing body, to "manage the economic affairs of the Community and charter subordinate organizations for economic purposes and to regulate the activities of all cooperative associations of members of the Community." *Id.* ¶ 35 (cleaned up).

2

Because there are numerous tribal entities implicated here, it is helpful to briefly explain the origins and structure of each entity.

The first relevant subordinate organization is the Fort Belknap Planning and Development Corporation, d/b/a Island Mountain Development Group (IMDG). The Tribal Council established IMDG in 2006 to "serve as a for-profit corporation that would focus and coordinate business planning and development activities for the [Tribe]." *Id.* ¶ 36 (cleaned up). IMDG is controlled by the IMDG Board, whose members are appointed by the Tribal Council. According to the complaint, the IMDG Board began to develop a lending operation in the late 2000s; according to plaintiff, the plan was that this lending operation would "offer, over the internet, small-dollar loans with ultra-high interest rates to non-tribal consumers." *Id.* ¶ 38.

In 2011, the Tribe established GVA Holdings, LLC. GVA's sole member is the Tribe, and when initially established it was managed by a non-tribal entity, Dater Portfolio Management LLC. *See id.*, Ex. 3 ¶ 1.8. Currently, however, GVA is managed by IMDG. In 2017, the Tribe established two additional entities: Aaniiih Nakoda Fund (ANF), d/b/a Bright Lending, and Aaniiih Nakoda Services (ANS). ANF's Articles of Operation indicate that its sole member and owner is GVA Holdings and its sole manager is IMDG. *See* McCabe Decl., Ex. F ¶¶ 1.8, 1.9. According to Bright Lending's website, ANF owns and operates the domain, which functions as the mechanism through which individuals apply for loans. *See* Compl. ¶ 46. ANS, as the name implies, purports to operate as ANF's service provider. According to Dixon, ANS's sole member and owner is IMDG. *See id.* ¶ 49.

Dixon alleges that although IMDG appears to be formally managed by a board

appointed by the Tribal Council, "non-tribal schemers like Gatzke have controlled, funded, and/or directed the day-to-day lending operations of the Tribe's various lending entities." *Id.* ¶ 39. Dixon bases this allegation, at least in part, on a statement from IMDG's former CEO, Evan Azure, that "[b]ecause the Tribe initially lacked experience in [online consumer lending], it relied on third parties to help it build capacity and develop a better understanding of the business and governing regulatory framework." *Id.*, Ex. 2 ¶ 10 (declaration of Evan Azure). According to Dixon, this statement reflects that the Gatzke Defendants and Newport Funding actually control IMDG and, by extension, Bright Lending, regardless of how the management structure may appear on paper.

Dixon contends that non-tribal parties have directed the lending operation since IMDG's inception and that efforts have been made throughout the years to further insulate the Gatzke Defendants and Newport Funding from legal scrutiny. Specifically, in 2017, the Consumer Financial Protection Bureau (CFPB) filed a lawsuit against Think Finance, LLC, for operating an allegedly illegal tribal lending scheme like the one at issue here. Also in 2017, the Tribe established Bright Lending and ANS. Dixon contends that the timing of the CFPB lawsuit and the creation of Bright Lending and ANS is relevant because Gatzke was the founding Chief Technology Officer at Think Finance. According to Dixon, the CFPB's lawsuit motivated the Gatzke Defendants and Newport Funding to attempt to "insulate" themselves "through an intentionally opaque corporate and management structure which was designed to obfuscate the reality of the Tribe's entirely superficial role in the lending business." *Id.* ¶ 45. Dixon contends that Bright Lending and ANS are merely shell entities with no employees and no independent boards managing them. *See id.* ¶¶ 47, 49. This contention is challenged

4

by IMDG's current CEO, defendant Taylor McCabe.  McCabe states in an affidavit that "IMDG currently has approximately 305 employees, more than half of which are FBIC tribal members" and that IMDG has an "employee leasing arrangement" with ANF and other Tribal subsidiaries.  McCabe Decl. ¶¶ 10–11.  According to McCabe, "all ANF employees are leased from IMDG," and "[a]ll management decisions for ANF— specifically including the language in loan documents, the interest rates charged, the parameters for loan approval, and the amounts that can be borrowed—are made by IMDG subject to limitations set forth in FBIC tribal law."  *Id.* ¶ 15.

At issue in this lawsuit are two loans issued to Dixon by Bright Lending.  Dixon filed his application for both loans via Bright Lending's website from his residence in Chicago.  In September 2022, Dixon applied and was approved for the first loan from Bright Lending.  This loan was for $1,250 and had an interest rate of 598.5461%.  The loan agreement indicates that the "finance charge," or "[t]he dollar amount the credit will cost [Dixon]," is $6,480.25.  Def. Newport Funding's Mot. to Dismiss Ex. A at 12.  In other words, if Dixon followed the payment plan of twenty-five bi-weekly payments of $308.40, Bright Lending would recoup more than five times the value of the loan provided.  Dixon ultimately made eight payments of $308.40 before paying the remaining balance, which after interest totaled $1,385.72.  In sum, Dixon paid Bright Lending $3,852.92 for the first $1,250 loan.

In December 2023, Dixon again applied and was approved for a loan from Bright Lending.  The second loan was also for $1,250 and had an interest rate of 499.9993%. The loan agreement indicates that the "finance charge" for this loan is $5,085.23, meaning that if Dixon followed the payment plan Bright Lending would recoup a little

5

over four times the amount of the loan. Dixon, however, only paid $1,008.23 for this loan before ceasing payments based on his belief that the loan was usurious and thus void under Illinois state law. Defendant McCabe attests that "ANF has voided and written off the unpaid balance on Mr. Dixon's second loan" and that "he has no further repayment obligations to ANF." McCabe Decl. ¶ 20.

In November 2024, Dixon filed the present suit. Dixon contends that the Gatzke Defendants, Newport Funding, and the Tribal Defendants engaged in an illegal tribal lending scheme, outlined above, that violates both the federal RICO statute and the Illinois Predatory Loan Prevention Act. Specifically, Dixon alleges that the defendants violated section 1962(c) of RICO, which makes it unlawful "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). RICO defines "unlawful debt," in part, as "a debt . . . (B) which was incurred in connection with . . . the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." *Id.* § 1961(6). Dixon further alleges that the defendants have violated section 1962(d) of RICO, which makes it unlawful "to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." *Id.* § 1962(d). Dixon also asserts a number of common law claims against the various defendants.

In response, the Gatzke Defendants, Newport Funding, and the Tribal Defendants have filed motions to dismiss, and, due to an order from this Court, incorporated by reference aspects of each other's briefs to avoid making duplicative arguments. *See* Minute Entry, Feb. 6, 2025, ECF No. 37. The defendants all assert

that Dixon's suit should be dismissed in its entirety under Federal Rules of Civil Procedure 12(b)(2) for lack of personal jurisdiction, Rule 12(b)(6) for failure to state a claim, and Rule 12(b)(7) for failure to join a party under Rule 19.

Because personal jurisdiction is a threshold matter, the Court will begin by addressing the defendants' arguments for dismissal under Rule 12(b)(2) before moving on to the remainder of the arguments. First, however, the Court will address an argument the defendants assert regarding how Dixon has organized his complaint.

### Discussion

### A.      "Group pleading"

As an initial matter, defendants contend that various aspects of Dixon's complaint are insufficient because it engages in so-called "group pleading" that "improperly lump[s] [defendants] together." *See* Def. Newport Funding's Mem. in Supp. of Mot. to Dismiss at 5; *see also* Br. in Supp. of Tribal Defs.' Mot. to Dismiss at 13–14; Gatzke Defs.' Mem. in Supp. of Mot. to Dismiss at 4–8. As a matter of law, "[t]here is no 'group pleading' doctrine, *per se*, that either permits or forbids allegations against defendants collectively." *Robles v. City of Chicago*, 354 F. Supp. 3d 873, 875 (N.D. Ill. 2019). Rather, "'[g]roup pleading' does not violate [Rule 8] so long as the complaint provides sufficient detail to put the defendants on notice of the claims." *Id.* On the question of whether sufficient notice is afforded to a particular defendant, the Seventh Circuit has instructed only that "at some point the factual detail in a complaint may be so sketchy that the complaint does not provide the type of notice of the claim to which the defendant is entitled under Rule 8." *Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*, 499 F.3d 663, 667 (7th Cir. 2007).

The defendants appear to acknowledge that "group pleading" is not a *per se* violation of Rule 8(a), but they contend that Dixon's allegations here do not provide sufficient notice of what the various defendants are claimed to have done. *See* Tribal Defs.' Reply in Supp. of Mot. to Dismiss at 7 n.2 ("The Tribal Defendants' position does not depend on finding a *per se* violation, but rather how the lack of individualized allegations and lack of non-conclusory allegations concerning the Tribal Defendants as a group fail to establish their involvement in a RICO enterprise."); *see also* Gatzke Defs.' Mem. in Supp. of Mot. to Dismiss at 5 (arguing that personal jurisdiction requires establishing each individual defendant's contacts with the forum and therefore allegations in the complaint directed at all defendants fail to meet the requirements of Rule 12(b)(2)); Def. Newport Funding's Mem. in Supp. of Mot. to Dismiss at 5 (arguing the same as the Gatzke Defendants).

The Court is satisfied that it can sufficiently parse the allegations in Dixon's complaint to determine whether allegations sufficiently allege personal jurisdiction and liability with regard to each defendant. Dixon is correct that group pleading is not, as such, impermissible, and defendants are likewise correct that Dixon must sufficiently allege personal jurisdiction and liability to survive the motions to dismiss.

Having noted the parties' arguments regarding group pleading, the Court will proceed to address the merits of the underlying motions.

**B.    Rule 12(b)(2)**

"A complaint need not include facts alleging personal jurisdiction." *Purdue Rsch. Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003) (cleaned up). Once a defendant moves to dismiss under Rule 12(b)(2), however, "the plaintiff bears

8

the burden of demonstrating the existence of jurisdiction." *Id.* When ruling based on written materials alone, without the benefit of an evidentiary hearing, the plaintiff is required only to make out a *prima facie* case of personal jurisdiction. *Id.* In determining whether a *prima facie* case has been established, the Court "take[s] the plaintiff's asserted facts as true and resolve[s] any factual disputes in its favor." *NBA Props., Inc. v. HANWJH*, 46 F.4th 614, 620 (7th Cir. 2022) (quoting *uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 423–24 (7th Cir. 2010)). A court may also consider affidavits on the issue of personal jurisdiction. *Id.* "[B]oth parties' affidavits are accepted as true, and where they conflict, the plaintiff is entitled to resolution in its favor." *Id.*

A court may have either general or specific personal jurisdiction over a party. *See Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358 (2021). General jurisdiction exists "only when a defendant is 'essentially at home' in the State." *Id.* (citation omitted). Specific jurisdiction, on the other hand, requires that the defendant "take some act by which it purposefully avails itself of the privilege of conducting activities within the forum State." *Id.* at 359 (cleaned up). The Seventh Circuit has articulated the following test for determining whether a district court has specific personal jurisdiction over a defendant:

> Specific personal jurisdiction requires that (1) the defendant has purposefully directed his activities at the forum state or purposefully availed himself of the privilege of conducting business in the state; (2) the alleged injury arises out of or relates to the defendant's forum-related activities; and (3) any exercise of personal jurisdiction must comport with traditional notions of fair play and substantial justice.

*Rogers v. City of Hobart*, 996 F.3d 812, 819 (7th Cir. 2021).

As amended, Illinois's long-arm statute contains a catchall provision stating that a court "may also exercise jurisdiction on any other basis now or hereafter permitted by

9

the Illinois Constitution and the Constitution of the United States."  735 ILCS 5/2-209(c) (West 2016).  Because Illinois's long-arm statute is co-extensive with the limits of due process, the Court must find that each defendant has established minimum contacts with the forum such that they may be haled into court in this forum.  "The proper focus of the 'minimum contacts' inquiry in intentional-tort cases is 'the relationship among the defendant, the forum, and the litigation.'"  *Walden v. Fiore*, 571 U.S. 277, 291 (2014) (quoting *Calder v. Jones*, 465 U.S. 783, 788 (1984)).

Here, all parties agree that none of the defendants can be subject to general jurisdiction.  Therefore, the Court will address only whether specific jurisdiction exists over the defendants.

### 1. Tribal Defendants

The Tribal Defendants contend that Dixon has not shown that they have the requisite minimum contacts with Illinois to establish personal jurisdiction in this forum. According to the Tribal Defendants, Dixon's complaint improperly lumps their actions together with those of the other defendants and thus that the individualized allegations necessary to establish jurisdiction over them are lacking.  This argument is unpersuasive.

The Tribal Defendants are current board members of IMDG.  IMDG, in turn, manages ANF, which operates as Bright Lending.  Bright Lending provided a loan to Dixon in Illinois.  Dixon's home address is clearly listed on the loan application, see Def. Newport Funding's Mot. to Dismiss Exs. A–B, so the Tribal Defendants would be aware that they were making a loan to an Illinois resident.  Further, Bright Lending's website advertises that it offers loans online, and allows residents of Illinois to file an application.

This is enough to establish *prima facie* that Bright Lending, through the Tribal Defendants, purposefully availed itself of Illinois's forum such that due process permits haling these defendants into court in Illinois.

### 2. Gatzke Defendants

The Court finds that Dixon has also alleged sufficient minimum contacts between the Gatzke Defendants and Illinois to establish personal jurisdiction in this forum. Gatzke is the CEO of defendant BWDS, LLC, which is the successor entity to BorrowWorks Decision Science, Inc.[1]  Gatzke Decl. ¶ 7.  In his motion, Gatzke concedes that "BWDS, LLC contracts with a tribal entity, Aaniiih Nakoda Services ('ANS'), to provide services under a written contract."  Gatzke Defs.' Mem. in Supp. of Mot. to Dismiss at 2.  According to the complaint, these services include providing the "technology platform," or website, that Bright Lending uses to process loan applications. Compl. ¶¶ 94–95.  Dixon further alleges that the "technology platform" is "where loans are underwritten."  *Id.* ¶ 95.  Dixon contends that BWDS "develops and maintains risk assessment strategies that can be used for credit decision underwriting, and develops advanced scoring models for its clients."  *Id.* ¶ 96 (cleaned up).  He further contends that "[t]he Gatzke Defendants also admit that they assist IMDG with marketing" but that "[t]hey claim . . . that any marketing proposals must ultimately be approved by Bright Lending."  *Id.* ¶ 97.  Finally, Dixon alleges that BWDS "offers 'full service portfolio management' for its clients, which includes 'decision science, loan servicing and marketing.'"  *Id.* ¶ 98 (cleaned up).  To be clear, Dixon has not offered evidence

---

[1] Gatzke has stated in an affidavit that BorrowWorks Decision Science, Inc. no longer exists.  Gatzke Decl. ¶¶ 7, 10.  Dixon does not dispute this.  Accordingly, the motion to dismiss is granted as to that particular Gatzke Defendant.

establishing that BWDS actually provides all these services to the various Tribal entities under its contract with ANS. At this point, however, he has alleged specific facts that are sufficient to support a finding of personal jurisdiction. *See B.D. ex rel. Myer v. Samsung SDI Co.*, 91 F.4th 856, 861 (7th Cir. 2024) (noting that the Seventh Circuit "appl[ies] a 'knowledge' version of the stream-of-commerce theory" and that under this theory, "[a]s long as a participant in [the stream of commerce] is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise" (quoting *Asahi Metal Indus. Co. v. Superior Ct. of Cal., Solano Cnty.*, 480 U.S. 102, 117 (1987) (Brennan, J., concurring)); *cf. Asahi Metal Indus. Co.*, 480 U.S. at 112 (opinion of O'Connor, J., joined by Rehnquist, C.J., and Powell and Scalia, JJ.) (finding that minimum contacts can be established by "[a]dditional conduct of the defendant [that] may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State").

As the complaint sets out, the Gatzke Defendants purposefully directed their conduct at Illinois through Bright Lending. Specifically, the Gatzke Defendants are alleged to have built and maintained Bright Lending's website, through which the loan applications are processed. This website purports to provide loans in forty-nine states, including Illinois. Having built and maintained the website, it is plausible that the Gatzke Defendants knew that loans could be issued in Illinois to Illinois residents and accordingly built the website to allow such residents to apply for loans. Dixon also

alleges that the Gatzke Defendants provide marketing for Bright Lending, adding more plausibility to the contention that they knew Bright Lending advertises its services in Illinois.  Further, the Gatzke Defendants allegedly provide the underwriting service for the loans and manage the risk assessment strategies of Bright Lending.  Based on the record, there are sufficient allegations to show *prima facie* that the Gatzke Defendants were aware that they were providing underwriting services for loan applications in Illinois (the Court notes in this regard that the loan applications include Dixon's home address in Chicago).  *See* Def. Newport Funding's Mot. to Dismiss Exs. A–B.

The Court concludes that the allegations summarized above are sufficient to establish a *prima facie* case that the Gatzke Defendants have sufficient minimum contacts with Illinois to permit assertion of personal jurisdiction over them in this matter. These sufficiently allege the Gatzke Defendants' participation in the claimed lending scheme such that they have purposefully availed themselves of Illinois's forum to do business.

### 3.    Newport Funding

#### a.    Minimum contacts

Though sufficient minimum contacts with Illinois exist to establish personal jurisdiction over the Gatzke Defendants, the same cannot be said for Newport Funding. Newport Funding contends that Dixon has failed to establish any contacts between it and Illinois, let alone constitutionally sufficient minimum contacts as required to exercise personal jurisdiction.

First, Newport Funding contends that Dixon's allegation that it is actually in control of IMDG, and in turn Bright Lending, is not supported by the record.  Specifically,

Dixon's complaint attaches a complaint filed by the Tribe in a prior lawsuit.  In that complaint, the Tribe alleges the following:

> On February 3, 2023, the third-party lenders, acting through their legal counsel, wrote a letter to the Council and the Chair of the Interim Board requesting that the Council sign a number of certifications "to evidence IMDG's good faith in curing the situations giving rise to the current events of default."  Among other terms, the third-party lenders requested IMDG to acknowledge that it would not change its legal counsel—i.e., the Defendants—without prior consultation with and approval by the third-party lenders.  The third-party lenders also requested a new legal opinion from the Defendants certifying that the appointment of the Interim Board was accomplished in compliance with Tribal law and IMDG organizational documents.

Compl., Ex. 6 ¶ 80.  Based on this, Dixon contends that Newport Funding, one of the unnamed "third-party lenders," now controls IMDG's management structure as well as its ability to appoint legal counsel, which, he says, shows the substantial control Newport Funding has over Bright Lending.

But in the very next paragraph of the complaint just referenced, the Tribe alleges that "IMDG declined to comply with the third-party lenders' request."  *Id.*, Ex. 6 ¶ 81.  In other words, according to the attached complaint, the Tribe did not agree to any of the provisions or certifications that Dixon now contends establish Newport Funding's control over the lending scheme.  Absent anything to support plaintiff's contention, and in light of evidence that directly undermines this argument, his allegation regarding Newport Funding's level of control over ANF reads as a conclusory statement, not a well-pleaded fact that a court appropriately takes as true for purposes of a motion to dismiss.

Dixon's argument that personal jurisdiction exists over Newport Funding is further undermined by his apparent concession that "Plaintiff does not allege that Newport Funding was involved in the day-to-day of the Bright Lending website or providing

14

formal tribal authority for Bright Lending to conduct business." Pl.'s Resp. to Newport Funding's Mot. to Dismiss at 5. Rather, according to Dixon, "Illinois law permits contacts with the forum state to be attributed to co-conspirators or joint-venturers even if the subject defendant was not the one that had the contact with the forum state." *Id.* That may be true as a general point. But as the Court explains below, Illinois caselaw makes clear that this is not an automatic attribution; a court still must make an independent determination that a particular defendant has sufficient minimum contacts with the forum state. "[T]he question . . . is whether a sufficient relationship existed under the Due Process Clause to permit the exercise of jurisdiction, not whether a partnership, joint venture, or other particular agency relationship between them existed." *Khan v. Gramercy Advisors, LLC*, 2016 IL App (4th) 150435, ¶ 170, 61 N.E.3d 107, 140 (cleaned up).

At most, Dixon contends that Newport Funding is the primary lender in the lending operation. But funding alone is not enough to establish the requisite minimum contacts with the forum state—especially when the funding was provided in a different state. *See, e.g.*, *Pennsylvania ex rel. Shapiro v. Think Finance, Inc.*, No. 14-cv-7139, 2018 WL 637656, at *9 (E.D. Pa. Jan. 31, 2018) (finding that, under Pennsylvania's Corrupt Organizations Act, "a defendant does not incur liability under the COA for merely funding an alleged unlawful enterprise" and thus concluding that personal jurisdiction required allegations that defendant was either "a principle or . . . a participant involved in the operation and management of the ['rent-a-tribe'] scheme"). Because Newport Funding's contacts would need to be between it and Illinois, the fact that it supplied funds in Montana to support a lending operation based out of Montana, without

more specific allegations, is insufficient to establish a *prima facie* basis for personal jurisdiction.

As a final point, language quoted from the *Think Finance* case does support the premise that being a "participant involved in the operation and management of the ['rent-a-tribe'] scheme" may be enough to support personal jurisdiction. This would appear to be a reference to an agency-based theory of personal jurisdiction. The problem here is that Dixon's allegations that Newport Funding was involved in the operation and management of the lending scheme are conclusory and unsupported. Among other things, there is nothing that indicates that Newport Funding controls IMDG's management or dictates its ability to appoint legal counsel. For these reasons, the Court concludes that Dixon has not shown *prima facie* that Newport Funding directed conduct at Illinois sufficient to establish the minimum contacts needed to support personal jurisdiction in this state.

### b. Conspiracy-based jurisdiction

Dixon also contends that the Court can exercise personal jurisdiction over Newport Funding based on a conspiracy-based theory of jurisdiction. Specifically, he contends that the conduct of co-conspirators may be imputed to other co-conspirators. Though that is certainly how the law of conspiracy works—it is a variation on the law of agency—Dixon overstates the simplicity by which a court can impute such contacts to co-conspirators for purposes of jurisdiction. First of all, several Illinois and Seventh Circuit cases question whether more or less *automatic* imputation comports with due process. *See, e.g.*, *Smith v. Jefferson Cnty. Bd. of Educ.*, 378 F. App'x 582, 585–86 (7th Cir. 2010) ("Even if [the conspiracy theory of jurisdiction] were viable, the theory

would not permit a plaintiff to draw a defendant into court in Illinois simply by alleging a conspiracy that includes some Illinois defendants and some out-of-state defendants, while making no effort to connect the two."); *Ploense v. Electrolux Home Prods., Inc.*, 377 Ill. App. 3d 1091, 1106, 882 N.E.2d 653, 667 (2007) (noting that, in a previous case questioning the constitutional validity of the conspiracy theory of jurisdiction, the Illinois Supreme Court "was concerned that the conspiracy theory of jurisdiction would allow the exercise of personal jurisdiction over a nonresident defendant who had no minimum contacts with the forum state").  These cases consistently support the premise that personal jurisdiction *always* requires minimum contacts with the forum.  *Cf. In re Aluminum Warehousing Antitrust Litig.*, 90 F. Supp. 3d 219, 234 (S.D.N.Y. 2015) (finding that "membership [in a committee involved in the conspiracy] alone cannot constitute the necessary purposeful availment" of the forum and that plaintiffs needed to "allege and have facts supporting [the defendant] taking specific actions or being a participant in a particular meeting . . . in which the unlawful conspiracy was furthered in some manner").

The case that Dixon primarily relies upon for the validity of conspiracy jurisdiction, *Khan v. Gramercy Advisors, LLC*, 2016 IL App (4th) 150435, 61 N.E.3d 107, does not support the contention that a co-conspirator's conduct can always be imputed to other co-conspirators.  In *Khan*, the Illinois state court of appeals simply noted that "minimum contacts do not have to be direct.  A person can purposefully make minimum contacts with the forum state through someone else."  *Khan*, 2016 IL App (4th) 150435, ¶ 190, 61 N.E.3d at 145.  The court in *Khan* found that personal jurisdiction over one of the defendants was proper because "by agreement between BDO and Gramercy

17

Advisors, BDO acted as an advertiser or conduit for Gramercy Advisors.

*Coconspirators or not*, Gramercy Advisors purposefully solicited business in Illinois

through BDO." *Khan*, 2016 IL App (4th) 150435, ¶ 191, 61 N.E.3d at 145 (emphasis

added). The court in *Khan* declined, however, to find personal jurisdiction over three

other defendants who were corporate affiliates of Gramercy Advisors and who were

alleged to have participated in the conspiracy; it determined that the plaintiff had not

established minimum contacts between those defendants and the forum state. It based

this finding upon an analysis of the Supreme Court's ruling in *Walden v. Fiore*, stating

that "the clear holding of *Walden* is that doing something outside the forum state that

has a foreseeable effect on someone inside the forum state does not serve as a

minimum contact with the forum state." *Khan*, 2016 IL App (4th) 150435, ¶ 133, 61

N.E.3d at 133. The court in *Khan* ultimately justified a finding of personal jurisdiction

over the Gramercy Advisors defendant on an independent determination that, as a co-

conspirator or not, Gramercy Advisors had the requisite minimum contacts to satisfy

due process based on its intentional direction of marketing into the forum state.

This does not mean that a co-conspirator's contacts with a forum may never be

imputed to co-conspirators for the purpose of establishing personal jurisdiction. The

court in *Khan* leaves space for this exact argument. Here, however, Dixon has not

persuasively shown that the Gatzke or Tribal Defendants' contacts with Illinois may be

imputed to Newport Funding consistent with due process.

### c. Personal jurisdiction under RICO

Dixon contends that personal jurisdiction exists over Newport Funding because

of a provision in RICO permitting nationwide service of process.[2]  The specific provision

Dixon invokes states:

> In any action under [civil RICO] in any district court of the United States in
> which it is shown that the ends of justice require that other parties residing
> in any other district be brought before the court, the court may cause such
> parties to be summoned, and process for that purpose may be served in
> any judicial district of the United States by the marshal thereof.

18 U.S.C. § 1965(b).  This means that the existence of personal jurisdiction ultimately

comes down to a question of whether haling a party before a forum comports with due

process.

The Seventh Circuit has found that "there is no constitutional obstacle to

nationwide service of process in the federal courts in federal-question cases" like this

one.  *See Lisak v. Mercantile Bancorp, Inc.*, 834 F.2d 668, 671 (7th Cir. 1987).  That is

because "[t]he 'minimum contacts' cases . . . require only sufficient contacts between

the defendant (or the defendant's transactions) and the forum."  *Id.* (collecting Supreme

Court cases).  Accordingly, "[t]he question is whether the polity, whose power the court

wields, possesses a legitimate claim to exercise force over the defendant."  *Id.*  Though

a federal court exercising diversity jurisdiction "generally may issue process only within

the territory a state court could," under federal question jurisdiction a federal court is not

exercising the power of any particular state, but rather that of the United States itself.

---

[2] Newport Funding contends that because Dixon did not "allege that any specific RICO
provision provides this Court with personal jurisdiction over any Defendant" that he is
"barred from relying on that basis here."  Def. Newport Funding's Mem. in Supp. of Mot.
to Dismiss at 4 n.2.  This is incorrect.  *See Purdue Rsch.*, 338 F.3d at 782.  And Rule
8(a), though requiring that a pleading's "claim for relief must contain:  (1) a short and
plain statement of the grounds for the court's jurisdiction," Fed. R. Civ. P. 8(a), refers to
subject matter jurisdiction, not personal jurisdiction over a party.  *See* 5 Wright & Miller
Federal Practice & Procedure § 1206 (4th ed. 2025) (collecting cases).

Accordingly, then, personal jurisdiction in a federal question case (such as this one) where a statute creates nationwide service of process requires showing only that the defendant has minimum contacts with the United States, as that is the relevant forum. *See id.*; *see also Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. Elite Erectors, Inc.*, 212 F.3d 1031, 1035 (7th Cir. 2000) (finding that, in the context of ERISA, "[the Seventh Circuit] ha[s] concluded that nationwide service under other statutes is proper, as long as the defendants have adequate contacts with the United States as a whole"); *Diamond Mortg. Corp. v. Sugar*, 913 F.2d 1233, 1244 (7th Cir. 1990) ("[T]he sovereign exercising its authority over the [defendants] is the United States," and therefore "whether there exist sufficient minimum contacts between the [defendants] and the State of Illinois has no bearing upon whether the United States may exercise its power over the [defendants] pursuant to its federal question jurisdiction."); *Siswanto v. Airbus*, 153 F. Supp. 3d 1024, 1027–28 (N.D. Ill. 2015) ("[W]hen the basis of personal jurisdiction involves a statute providing for nationwide service of process . . . [t]he relevant minimum contacts in these instances simply lie with the United States as a whole and not just the forum state (here, Illinois)." (internal citation omitted)); *Johnson Controls, Inc. v. Exide Corp.*, No. 00 C 3852, 2000 WL 1849293, at *1 (N.D. Ill. Dec. 15, 2000) ("By thus authorizing the nationwide service of process, Section 1965(b) creates personal jurisdiction over any person within the United States.").

Newport Funding indisputably has the requisite minimum contacts with the United States, as it is a limited liability company formed under the laws of Delaware and does business within the United States. That, however, is not the end of the inquiry. As the text of section 1965(b) makes clear, a district court must determine that "the ends of

20

justice require" haling a defendant into a potentially distant forum. RICO provides no definition for this phrase, and there is a circuit split over its definition. Within the Seventh Circuit, however, the trend appears to be to interpret "ends of justice" narrowly. In *Lisak*, the court noted that "[a] district court in Indiana will have [personal] jurisdiction whether or not [the defendant] can be brought before the court in Illinois, so perhaps the ends of justice do not 'require' his presence in this suit." *Id.* at 672. Though this phrase is clearly dicta, other courts in this District have applied this logic when adjudicating whether section 1965(b) allows the exercise of personal jurisdiction over out-of-state defendants that the court otherwise would lack. *See, e.g.*, *Rossetti v. Saban*, No. 21 C 4324, 2023 WL 5846871, at *9 (N.D. Ill. Sep. 11, 2023) (relying on *Lisak* for the finding that "[a] district court in Pennsylvania would have jurisdiction, and venue would be proper, whether or not Defendants can be brought before the court in Illinois, so the ends of justice do not require Defendants' presence here"); *Bartlett v. Bartlett*, No. 16 C 6595, 2017 WL 106043, at *4 (N.D. Ill. Jan. 11, 2017) (relying on *Lisak* to conclude that "[b]ecause another venue appropriate to all defendants exists in the Southern District of Illinois, the 'ends of justice' do not require [some defendants] be haled into this district— where no alleged conduct occurred and no party resides").

The Court concludes that following a similar course as the court took in *Bartlett* is appropriate. Because Newport Funding contracts with the Tribe in Montana, it would be subject to personal jurisdiction there. The Gatzke Defendants would be subject to personal jurisdiction in Montana for similar reasons, and the Tribal Defendants would be subject to personal jurisdiction in Montana for obvious reasons. In line with the logic of *Lisak* and *Bartlett*, because a district court in Montana can exercise jurisdiction over all

21

defendants, the ends of justice do not seem to require haling Newport Funding before this Court.

### 4. Jurisdictional discovery

In his response, Dixon asks to engage in "limited" jurisdictional discovery with respect to any defendant over which the Court determines that, on the current record, it lacks personal jurisdiction. A district court has discretion to permit limited discovery to establish whether personal jurisdiction exists if the plaintiff has established "a colorable or prima facie showing of personal jurisdiction." *Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 946 (7th Cir. 2000). "Put differently, a plaintiff seeking jurisdictional discovery must advance 'proof to a reasonable probability' of the facts necessary to establish federal jurisdiction." *Indag GmbH & Co. v. IMA S.P.A.*, 150 F. Supp. 3d 946, 971 (N.D. Ill. 2015) (quoting *Anthony v. Sec. Pac. Pin. Servs., Inc.*, 75 F.3d 311, 316 (7th Cir. 1996)).

Dixon has not made a colorable showing of jurisdiction over Newport Funding as required to permit jurisdictional discovery. Preliminarily, Dixon does not provide the Court with any insight into what specific discovery he proposes to engage in that might help establish personal jurisdiction. Along this vein, it is unclear to the Court how to cabin such discovery, and it seems reasonably likely that "limited" jurisdictional discovery would end up being more or less co-extensive with merits discovery. For these reasons, the Court declines Dixon's request for jurisdictional discovery.

\*                    \*                    \*

To recap, the Court finds that it lacks personal jurisdiction over Newport Funding. The Court does find that Dixon has made a *prima facie* case that the Court has personal

22

jurisdiction over the Tribal and Gatzke Defendants.  Accordingly, the Court grants only Newport Funding's motion to dismiss under Rule 12(b)(2).

## B.  Rules 12(b)(7) and 19

Defendants next argue that Dixon's case must be dismissed under Rule 12(b)(7) for "failure to join a party under Rule 19."  Fed. R. Civ. P. 12(b)(7).  Rule 19 requires joinder of all necessary parties as defined by the rule; if joinder is not feasible, the rule requires the Court to determine whether a necessary party is indispensable.  "The purpose of Rule 19 is to 'permit joinder of all materially interested parties to a single lawsuit so as to protect interested parties and avoid waste of judicial resources.'" *Askew v. Sheriff of Cook Cnty.*, 568 F.3d 632, 634 (7th Cir. 2009) (quoting *Moore v. Ashland Oil, Inc.*, 901 F.2d 1445, 1447 (7th Cir. 1990)).  Dismissal under Rule 19 "is not the preferred outcome," and the Seventh Circuit has instructed that courts should be "reluctant to dismiss for failure to join where doing so deprives the plaintiff of his choice of federal forum."  *Id.* (quoting *Davis Cos. v. Emerald Casino, Inc.*, 268 F.3d 477, 481 (7th Cir. 2001)).

Courts engage in a two-step inquiry under Rule 19.  First, a court must determine whether a party falls within the scope of the rule.  Rule 19(a)(1) defines who is a required party:

> (1) *Required Party*.  A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:
> (A) in that person's absence, the court cannot accord complete relief among existing parties; or
> (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
> (i) as a practical matter impair or impede the person's ability to protect the interest; or
> (ii) leave an existing party subject to a substantial risk of

23

incurring double, multiple, or otherwise inconsistent obligations because of
the interest.

Fed. R. Civ. P. 19(a)(1).

Defendants contend that the Tribe is a required party because of its "significant
sovereign and economic interests in the continued operation of the tribal enterprises
that are critical to its self-governance."  Br. in Supp. of Tribal Defs.' Mot. to Dismiss at 7.
Defendant McCabe attests that "IMDG currently has approximately 305 employees,
more than half of which are FBIC tribal members, making IMDG one of the most
important employers in the area of the Fort Belknap Reservation."  McCabe Decl. ¶ 10.
McCabe further states that "[t]he majority of [Bright Lending's] cash profitability goes to
IMDG" and that "IMDG, as the Tribe's economic development arm, passes profits to the
Tribe and uses other revenues to fund projects that benefit FBIC tribal members,
including housing and healthcare facilities," as well as other "governmental services for
tribal membership."  *Id.* ¶¶ 17–18.  According to McCabe, "IMDG revenues are the
Tribe's largest source of non-federal funding."  *Id.* ¶ 18.  Based on these statements, it
appears that the Tribe has "an interest relating to the subject of the action" and
proceeding in its absence may "impair or impede [its] ability to protect the interest."  *See*
Rule 19(a)(1).  Accordingly, the Court finds that the Tribe qualifies as a necessary party
to the present action.

The Tribe, however, cannot be joined.  "Indian tribes have long been recognized
as possessing the common-law immunity from suit traditionally enjoyed by sovereign
powers."  *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58 (1978).  Congress must
expressly abrogate a tribe's sovereign immunity; "without congressional authorization,
the Indian Nations are exempt from suit."  *Id.* (citation and quotation marks omitted).

24

RICO contains no such express abrogation. Absent an express waiver of sovereign immunity from the Tribe, it cannot be held liable under RICO. And it is undisputed that the Tribe has not waived its immunity here. Therefore, this is an instance where the Tribe is a required party under Rule 19(a), but joinder is not feasible.

Rule 19(b) addresses when a court has determined that a party is necessary but "joinder is not feasible":

> If a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed. The factors for the court to consider include:
>     (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;
>     (2) the extent to which any prejudice could be lessened or avoided by:
>         (A) protective provisions in the judgment;
>         (B) shaping the relief; or
>         (C) other measures;
>     (3) whether a judgment rendered in the person's absence would be adequate; and
>     (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

Fed. R. Civ. P. 19(b).

The Tribal Defendants contend that "a large body of precedent holds that dismissal naturally follows when an absent required party cannot be joined due to sovereign immunity." Br. in Supp. of Tribal Defs.' Mot. to Dismiss at 8 (collecting cases). Only one of the cases cited by the Tribal Defendants is binding authority here. In *Republic of Philippines v. Pimentel*, 553 U.S. 851 (2008), the Supreme Court considered whether a case could proceed when a necessary foreign party could not be joined due to sovereign immunity. *See id.* at 861. The Court found that "where sovereign immunity is asserted, and the claims of the sovereign are not frivolous,

dismissal of the action must be ordered where there is potential for injury to the interests of the absent sovereign." *Id.* at 867. Despite the Tribal Defendants' contention regarding *Pimentel*, dismissal under Rule 19 due to a failure to join a party who cannot be joined due to sovereign immunity is anything but automatic. First, the reviewing court must find that the claim of sovereign immunity is not frivolous. Then, the court must determine that there is potential injury to the interests of the absent sovereign. Only if both conditions are met does *Pimentel* instruct that dismissal is called for.

The Tribe's claim of sovereign immunity is not frivolous. As defendant McCabe states, IMDG—and by extension, Bright Funding's lending operation—is both a main employer of tribal members as well as an important source of tribal funds. But the potential for injury to the sovereign's interest is not such that *Pimentel* controls. As explained below, the Court finds that the Tribal Defendants can adequately represent the Tribe's interests in this action.

Turning to the Rule 19(b) factors, the Court finds that the present suit may proceed "in equity and good conscience" without joining the Tribe as a defendant. The first factor—the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties—"involves the same considerations [the Court] discussed in concluding that the Tribe is a necessary party." *United States ex rel. Hall v. Tribal Dev. Corp.*, 100 F.3d 476 (7th Cir. 1996). As previously discussed, the Tribe does have a sovereign and economic interest in ensuring that it is able to continue exercising its sovereign right to, as the Tribal Defendants argue, "enact[] its own laws, establish[] its own economic enterprises pursuant to those laws, negotiat[e] contracts, and provid[e] governmental services to its reservation and members." Br. in Supp. of

26

Tribal Defs.' Mot. to Dismiss at 9. But the contention that the Tribe will be prejudiced by a judgment rendered in its absence such that it is an indispensable party is unpersuasive. The Tribe's interest is to ensure that it may continue to disburse loans under tribally enacted laws allowing this. Similarly, the Tribal Defendants' interest is to ensure they can continue to operate the lending business via IMDG and, in turn, Bright Lending. In other words, the Tribe and the Tribal Defendants share overlapping interests, and the Tribal Defendants' defense of their right to continue operating Bright Lending overlaps with the Tribe's defenses such that the Tribe's interests will be represented.

Examination of the second and third Rule 19(b) factors—the extent to which any prejudice could be lessened or avoided by shaping relief and whether a judgment rendered in the person's absence would be adequate—further establishes that the Tribe will not be prejudiced by a judgment in its absence. In their brief, the Tribal Defendants contend that the injunctive relief sought "would effectively bar the Tribal Defendants from continuing to operate the Tribe's online consumer lending enterprises" and thus "[t]here is no way to limit the requested relief without infringing on the Tribe's sovereign and economic interests." *Id.* at 10. But the Tribal Defendants then go on to assert that any judgment rendered against them alone "would not be binding on the Tribe in any event, leaving it free to continue the lending activity to which [Dixon] objects." *Id.* This, the Tribal Defendants contend, could lead to inconsistent judgments resulting in further litigation, thus making any judgment rendered in the Tribe's absence inadequate. *See Provident Tradesmen Bank & Tr. Co. v. Patterson*, 390 U.S. 102, 111 (1968) (finding that Rule 19(b)(3) refers to "the interest of the courts and the public in complete,

27

consistent, and efficient settlement of controversies" and "the public stake in settling disputes by wholes, whenever possible").

These arguments are unavailing. It does not appear that there will be any need to shape relief to avoid prejudice to the Tribe itself, because an injunction against the Tribal Defendants would not bar the Tribe, a non-party, from creating and pursuing a separate lending enterprise. As for the adequacy of the requested relief in the absence of the Tribe, Dixon's requested relief is to enjoin Bright Lending's lending operation. An injunction against the Tribal Defendants would do just that and would therefore be adequate. Conversely, a judgment in the Tribal Defendants' favor will permit them to carry on with the existing business on behalf of the Tribe and thus would be adequate for the Tribe as well. The possibility of future litigation related to loans by some hypothetical future tribal entity is too speculative to warrant consideration.

Finally, the Tribal Defendants concede that "dismissal on Rule 19 grounds could leave [Dixon] without an adequate remedy such that Rule 19(b)(4) weighs against dismissal." Br. in Supp. of Tribal Defs.' Mot. to Dismiss at 10. The Court agrees. The Tribal Defendants contend that this lack of remedy is an "inevitable result of sovereign immunity," asserting that courts have "uniformly held that it is not a sufficient reason to allow a claim to proceed in the absence of a required sovereign." *Id.* But the cases relied on by the Tribal Defendants all emphasize that the Rule 19(b) analysis requires consideration of all four factors, not just one of them. Here, the Court has found that all four factors weigh in favor of Dixon, making the cases relied upon by the Tribal Defendants inapposite.

The Court concludes, after considering all of the appropriate factors under Rule

19(b), that they do not weigh in favor of dismissal.  The present suit may proceed in equity and good conscience without the Tribe as a defendant because its interest in continuing Bright Lending's operations will be adequately represented by the Tribal Defendants, and because any relief granted in this case will not prejudice the Tribe's sovereign or economic rights to such an extent that the Tribe is indispensable to the litigation.  The Court therefore denies the defendants' motions to dismiss under Rule 12(b)(7).

## C.      Rule 12(b)(6)

Finally, defendants move for dismissal under Rule 12(b)(6).  To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), the plaintiff's complaint must contain sufficient factual allegations that state a plausible claim for relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is plausible when the facts as alleged lead the Court to a reasonable inference that the defendant is liable for the alleged misconduct.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In deciding a motion to dismiss for failure to state a claim, a court takes the plaintiff's well-pleaded facts as true and draws all reasonable inferences in the light most favorable to the plaintiff.  *Emerson v. Dart*, 109 F.4th 936, 941 (7th Cir. 2024).  The plaintiff need only allege enough facts to "nudge[] their claims across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 570.  In addition to the pleadings, a plaintiff opposing a Rule 12(b)(6) motion "may submit materials outside the pleadings to illustrate the facts [it] expects to be able to prove."  *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012).

Though the Court has already determined that Newport Funding must be dismissed due to a lack of personal jurisdiction, it will still consider arguments made by

29

Newport Funding that the other defendants have incorporated in their briefs. For the reasons set forth below, the Court concludes that Dixon has stated plausible claims for relief.

**1.    RICO claims**

**a.    18 U.S.C. § 1962(c) (Counts 1 & 8)**

Dixon alleges that all defendants have violated two provisions of RICO: section 1962(c) and section 1962(d). A RICO claim under section 1962(c) requires proof of four elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 655 (7th Cir. 2015). The defendants' arguments boil down to contentions that Dixon has failed to plausibly allege the conduct element, the existence of a RICO enterprise, and racketeering activity.

**i.    Conduct**

Section 1962(c) makes it illegal "to conduct or participate, directly or indirectly, in the conduct of [a RICO] enterprise's affairs." 18 U.S.C. § 1962(c). The Supreme Court has interpreted "the word 'conduct' to require some degree of direction and the word 'participate' to require some part in that direction." *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993). The Court further explained:

> In order to "participate, directly or indirectly, in the conduct of such enterprise's affairs," one must have some part in directing those affairs. Of course, the word "participate" makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase "directly or indirectly" makes clear that RICO liability is not limited to those with a formal position in the enterprise, but *some* part in directing the enterprise's affairs is required.

*Id.* This interpretation is meant to prevent section 1962(c) from reaching "complete

30

outsiders" who did not participate "in the conduct of the '*enterprise's* affairs'" but rather "just their *own* affairs." *Id.* at 185. In other words, to be liable under section 1962(c), "one must participate in the operation or management of the enterprise itself." *Id.*

The Gatzke Defendants contend that Dixon has failed to plausibly allege how they control the alleged enterprise and instead makes only allegations related to "routine services the [Gatzke] Defendants performed in the scope of their contractual obligations." Gatzke Defs.' Mem. in Supp. of Mot. to Dismiss at 12. As made clear by the above language from *Reves*, however, it is not necessary for the Gatzke Defendants to have exerted control over the alleged lending scheme. At this point, what Dixon must plausibly allege is that the Gatzke Defendants directed, even indirectly, the operation or management of the lending enterprise.

The Court concludes that Dixon has plausibly alleged that the Gatzke Defendants had the requisite level of participation in the alleged scheme to be liable under section 1962(c). Dixon contends that the Gatzke Defendants are the actual ringleaders of the lending scheme and "play a hands-on role in the day-to-day execution of the Bright Lending operation." Compl. ¶ 88. The Gatzke Defendants are correct that Dixon's allegation that they "exert significant control over the lending operation," *id.*, is not supported by conflicting statements in defendant McCabe's affidavit, see McCabe Decl. ¶¶ 7, 15. Dixon does plausibly allege, however, that the Gatzke Defendants participated in the operation of the alleged lending scheme by building and maintaining the lending platform, "develop[ing] and maintain[ing] risk assessment strategies that can be used for credit decision underwriting, and develop[ing] advanced scoring models for [their] clients." Compl. ¶ 96. The Gatzke Defendants concede that they have a

31

contractual business relationship with ANS and, by extension, Bright Lending, though at this point it is unclear what specific contractual obligations this entails. But that is of little consequence at this stage. The Court concludes that Dixon has plausibly alleged that the Gatzke Defendants directed the affairs of the lending operation by creating procedures for determining who should be granted loans via its underwriting and scoring models. And Dixon has plausibly alleged that the Gatzke Defendants at least indirectly participated in the operation of the lending platform by controlling Bright Lending's marketing and maintaining the lending platform to ensure that individuals like Dixon could apply for the allegedly usurious loans.

The Court also finds that Dixon has plausibly alleged how the Tribal Defendants' conduct makes them liable under section 1962(c). The Tribal Defendants begin by raising concerns over what they contend is a lack of individualized allegations against each Tribal Defendant. They argue that RICO claims are fact-intensive and the requisite facts of liability "must be established as to each individual defendant." Br. in Supp. of Tribal Defs.' Mot. to Dismiss at 13 (quoting *Brewer v. Village of Old Field*, 311 F. Supp. 2d 390, 400 (E.D.N.Y. 2004)). This argument is unavailing; as the Court addressed at the outset, the policy underlying Rule 8(a)'s pleading requirement is affording proper notice to each defendant of what it is accused of doing and the nature of its involvement in the alleged misconduct. Dixon's complaint affords each Tribal Defendant sufficient notice of what it is alleged to have done.

The complaint directs allegations at the Tribal Defendants as a whole because, according to Dixon, they collectively knew that Bright Lending was being exploited by the Gatzke Defendants and other third parties. Each Tribal Defendant is alleged to

32

have participated in the alleged lending scheme by agreeing to insulate third parties from state usury law liability by shrouding them in the Tribe's sovereign immunity. This is sufficient to plausibly allege that each of the Tribal Defendants had at least indirect participation in the operation of the lending enterprise.

The Tribal Defendants next contend that Dixon's complaint does not sufficiently allege that they controlled or managed any aspect of the alleged lending scheme as required to make them liable under section 1962(c). This argument is a non-starter. The Tribal Defendants controlled IMDG, which manages Bright Lending and ANS. Although Dixon alleges that third parties are the true directors of the scheme, the Tribal Defendants are alleged to have participated in the direction of the scheme by providing the corporate vehicle for the lending program. Dixon alleges that they are far from passive—he alleges the Tribal Defendants are aware of the illegal nature of the lending operation and permitted the Gatzke Defendants and others to continue using tribal entities to perpetuate the scheme. At the very least, this is indirect participation in the operation of a RICO enterprise. These allegations give rise to a plausible inference that the Tribal Defendants engaged in the sort of conduct required to render them liable under section 1962(c).

### ii. RICO enterprise

Dixon contends that he has sufficiently alleged that all of the defendants participated in an association-in-fact enterprise under RICO. *See* 18 U.S.C. § 1961(4) (defining an "enterprise" to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity"). Courts have found that, based on this statutory language, RICO

broadly defines the term enterprise. *See Boyle v. United States*, 556 U.S. 938. 944 (2009) (collecting cases). To properly plead an association-in-fact enterprise, the plaintiff must allege at least three features: (1) "a purpose," (2) "relationships among those associated with the enterprise," and (3) "longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 946. The enterprise must also have "a structure and goals separate from the predicate acts themselves." *United States v. Masters*, 924 F.2d 1362, 1367 (7th Cir. 1991). But all this means, the Supreme Court has explained, is that "the existence of an enterprise is an element distinct from the pattern of racketeering activity and 'proof of one does not necessarily establish the other.'" *Boyle*, 556 U.S. at 947 (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)). An enterprise may, however, be inferred "from the evidence showing that persons associated with the enterprise engaged in a pattern of racketeering activity." *Id.* ("We recognized in *Turkette* that the evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise may in particular cases coalesce." (internal citation and quotation marks omitted)).

Defendants contend that Dixon has failed to properly allege a RICO enterprise. Specifically, defendants argue that Dixon has not adequately identified a relationship among the defendants or alleged a discernable structure that would satisfy the requirements the Court outlined in *Boyle*. According to the defendants, "there is no intersection between the actions of the various defendant groups," and thus they contend that Dixon has failed to sufficiently allege how they have coordinated their conduct to meet a common purpose. *See Rao v. BP Prods. N. Am., Inc.*, 589 F.3d 389, 400 (7th Cir. 2009).

The Court is not persuaded by these arguments. The complaint alleges that the defendants had the shared purpose of distributing short-term, high-interest loans. The structure of the enterprise is also separate from the predicate act of collecting unlawful debt. As Dixon alleges, the Tribal Defendants maintain outward-facing control of IMDG, Bright Lending, and ANS via a corporate structure that purports to place them in control while permitting third parties to direct the funding scheme behind the scenes. Further, the Gatzke Defendants concede that they have a contractual relationship with ANS, the service provider of Bright Lending, which in turn is controlled by IMDG and the Tribal Defendants. As Dixon describes in the complaint, this structure allows for longevity by insulating the third parties involved in the alleged lending scheme from legal scrutiny, allowing them to continue funding the enterprise and approving loans.

Dixon further alleges that the various defendants shared the common goal of perpetuating the allegedly illegal lending scheme by insulating third parties from liability under the veil of tribal sovereign immunity so that they could collectively continue the scheme through Bright Lending. Dixon sufficiently outlines how the defendants worked together and carried out and/or acquiesced to the conduct that created the lending scheme and allowed it to continue despite efforts to crack down on such lending operations. The goals of each participant in the scheme can also be characterized as separate from the collection of unlawful debt; the Tribal Defendants' alleged goal is to assure that money is brought to the Tribe and that tribal members can be gainfully employed, whereas the Gatzke Defendants' alleged goal is to insulate themselves from state usury laws by partnering with the Tribe. Although the goal of the alleged RICO enterprise dovetails with the predicate act of collecting unlawful debt, that does not

mean that Dixon has failed to plausibly allege a RICO enterprise.  Rather, this is an instance—specifically anticipated by the Supreme Court—in which there is an overlap in the evidence offered to show the existence of a RICO enterprise and the evidence of the pattern of racketeering activity.  *See Turkette*, 452 U.S. at 583.  Based on these allegations in the complaint, the Court concludes that Dixon has plausibly alleged a RICO enterprise.

### iii.    Racketeering activity

To be liable under section 1962(c) as implicated here, a plaintiff must allege that a defendant conducted the enterprise's affairs "through . . . collection of unlawful debt." 18 U.S.C. § 1962(c).  The defendants argue that Dixon has failed to plausible allege that any defendant collected unlawful debt as courts have interpreted that phrase. According to the defendants, to properly allege the act of "collection" Dixon must show that they "induced in [some] way [a] person to make repayment."  *United States v. Pepe*, 747 F.2d 632, 674 (11th Cir. 1984).  The defendants contend that Dixon concedes in the complaint that he "voluntarily" made regular payments on his loans and, correspondingly, fails to allege how any of the defendants "induced" him to make these repayments.  Further, the defendants argue that Dixon fails to allege that the defendants knowingly collected unlawful debt and thus that the "requisite criminal intent or *mens rea* required under 18 U.S.C. § 1962(c)" has not been properly pled.  Br. in Supp. of Tribal Defs.' Mot. to Dismiss at 17.

The Court disagrees.  First, the *Pepe* case relied on by defendants is not binding on the Court and involved an entirely different application of section 1962(c).  Therefore, arguments relying on statutory interpretation and *mens rea* as discussed in *Pepe* are

36

inapt.

The Court declines to adopt the interpretation of "collection" as defined by the Eleventh Circuit in *Pepe*. The plain meaning of "collect" includes "to claim as due and receive payment for." *Collect*, Merriam-Webster, https://www.merriam-webster.com/ dictionary/collect (last visited July 1, 2025). Even if one accepts that collection requires "inducing," the plain meaning of "induce" includes "to call forth or bring about by influence or stimulation." *Induce*, Merriam-Webster, https://www.merriam-webster.com/ dictionary/induce (last visited July 1, 2025). In other words, the term "collect" is relatively expansive and not as constricted as defendants contend.

The loan agreements are written in a way as to amount to "inducing" payment. Dixon's loan agreements include a payment schedule establishing a bi-weekly payment plan. *See* Def. Newport Funding's Mot. to Dismiss Exs. A–B. They include a clause titled "Your Promise to Pay," which states that by signing the loan agreement, "[y]ou promise to pay your loan together with finance charges and any other amounts due under this Agreement." *Id.* The loan agreements allow the loan recipient to select "the method that you will use to make payments on your loan" and permit automated payments directly from the loan recipient's bank account. They also include a clause for "Late Payment Fees" and state that "[i]f we do not receive a payment in full within 5 business days after the date it is due, then we may charge you a Late Payment Fee of 10% of the amount the payment not paid in full." *Id.* The agreements further provide that "[w]e consider you in default if[] you do not pay as required by this Agreement" and caution that "[i]f you default, at our option we can accelerate the entire unpaid amount of your loan and declare the unpaid balance immediately due and payable." *Id.* The loan

agreements end by stating that clicking the "Agree" button functions as an electronic signature that indicates acceptance of all terms within the agreements.  *Id.*

The loan agreements' terms thus make clear that Dixon has plausibly alleged the defendants engaged in the collection of unlawful debts.  First, the repayment schedule in the agreements functions as a means of collection; the agreements say that payment is due every two weeks.  The loan agreements contemplate and allow automated payments, which are taken directly from the recipient's designated bank account.  It is difficult to accept the contention that establishing such a repayment structure does not fall within the dictionary definition of collection.  Further, the fact that the loan agreements permit automated repayment undermines the defendants' contention that they must be shown to intend to collect the debts.  By setting up automated repayments, the intention to collect payments on loans is obvious.  The late-payment fees and default mechanisms imposed by the loan agreements further weaken defendants' argument.  The contractual obligation to make repayments along a set timeline or suffer adverse economic consequences is the type of influence or stimulation to make a repayment that indicates the defendants are inducing collection of these debts.  Therefore, the defendants loans would still meet the more restrictive definition of collection set forth by the Eleventh Circuit in *Pepe*.

As for intent, *Pepe* involved a criminal, not a civil, RICO charge, and the court in *Pepe* discussed *mens rea* in the context of jury instructions.  Regardless of these distinctions, the defendants' arguments regarding *mens rea* fail for a more glaring reason:  the loan agreements clearly state how and when the loans are to be repaid. The defendants quite plainly are plausibly alleged to have known the terms of the loans

38

they issued.  In sum, none of defendants' arguments lead the Court to conclude that Dixon has failed to allege the necessary racketeering activity or that the defendants had knowledge of such activity.

In sum, the Court concludes that Dixon has plausibly alleged the necessary elements of a section 1962(c) violation.  Accordingly, the Court denies defendants' motions to dismiss Counts 1 and 8.

### b.    18 U.S.C. § 1962(d) (Counts 2 & 8)

Defendants also contend that Dixon fails to plausibly allege a RICO conspiracy (Count 2 against the Gatzke Defendants and Count 8 against the Tribal Defendants) under section 1962(d).  This section makes it unlawful to conspire to violate section 1962(c).  To establish a claim under section 1962(d), Dixon must show that "(1) the defendant agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity, and (2) the defendant further agreed that someone would commit at least two predicate acts to accomplish those goals."  *United Food & Com. Workers Union & Emps. Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 856 (7th Cir. 2013) (citations and internal quotation marks omitted).  "[T]he touchstone of liability under § 1962(d) is an agreement to participate in an endeavor which, if completed, would constitute a violation of the substantive statute."  *Id.*  In general, a claim of conspiracy requires showing "a particular defendant joined the conspiracy and knew of its scope."  *Bank of Am. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013).  The defendants contend that Dixon has failed to allege when each individual defendant joined the conspiracy and what exactly each defendant knew about the conspiracy's operation.

39

The Tribal Defendants go so far as to argue that "because the Complaint contains no allegations concerning *any* act by *any* of the Tribal Defendants, it fails to allege that any defendant entered into an unlawful agreement, knowingly or otherwise." Br. in Supp. of Tribal Defs.' Mot. to Dismiss at 17.  It is difficult for the Court to ascertain where the Tribal Defendants get this.  As outlined above, Dixon's complaint contains numerous specific allegations regarding the Tribal Defendants' involvement in the alleged lending scheme—most specifically, their alleged acquiescence to allow the Gatzke Defendants to direct Bright Lending's operations and the allegation that they did so knowingly to receive a financial benefit for themselves and the Tribe.

The Gatzke Defendants first contend that Dixon has failed to meet Rule 9(b)'s heightened pleading standard for fraud.  Dixon, however, has not alleged fraud, and thus he is required only to meet the requirements of Rule 8(a).  The Court therefore declines to address the arguments regarding Rule 9(b).  The Gatzke Defendants also argue, in line with the Tribal Defendants, that Dixon has failed to allege how they individually furthered the RICO conspiracy.  This contention is without support in the record.  At the very least, the complaint outlines the Gatzke Defendants' role in building and maintaining Bright Lending's website, and it includes further allegations plausibly explaining how the Gatzke Defendants are involved in the alleged lending scheme by providing underwriting and marketing services.

For these reasons, the Court concludes that Dixon has plausibly stated a claim for a RICO conspiracy under section 1962(d) and thus denies defendants' motions to dismiss Counts 2 and 8.

### c.     Availability of injunctive relief under RICO (18 U.S.C. § 1964)

Dixon seeks only equitable relief against the Tribal Defendants under RICO.  The

Tribal Defendants, however, contend that Dixon's RICO claim against them must be

dismissed because a private plaintiff supposedly cannot obtain equitable relief under

RICO.  According to the Tribal Defendants, "the prospective declaratory and injunctive

relief" sought "is unavailable as a matter of law."  *Id.* at 18.  Wrong.  As the Tribal

Defendants concede, binding Seventh Circuit precedent makes such relief available to

Dixon.  Despite the Tribal Defendants' argument that other federal circuits have found

such injunctive relief unavailable, this Court is bound by the Seventh Circuit's holding.

In *National Organization for Women, Inc. v. Scheidler*, 267 F.3d 687 (7th Cir.

2001), *rev'd on other grounds*, 537 U.S. 393 (2003), the Seventh Circuit found that the

plain text of RICO's provision authorizing civil remedies, 18 U.S.C. § 1964, makes

injunctive relief available to private parties.  Section 1964 of RICO provides, in pertinent

part:

> (a) The district courts of the United States shall have jurisdiction to prevent
> and restrain violations of section 1962 of this chapter by issuing appropriate
> orders, including, but not limited to . . . imposing reasonable restrictions on
> the future activities . . . of any person, including, but not limited to,
> prohibiting any person from engaging in the same type of endeavor as the
> enterprise engaged in, . . . or ordering dissolution or reorganization of any
> enterprise, making due provision for the rights of innocent persons.
>
> (b) The Attorney General may institute proceedings under this section.
> Pending final determination thereof, the court may at any time enter such
> restraining orders or prohibitions, or take such other actions, including the
> acceptance of satisfactory performance bonds, as it shall deem proper.
>
> (c) Any person injured in his business or property by reason of a violation
> of section 1962 of this chapter may sue therefor in any appropriate United
> States district court and shall recover threefold the damages he sustains
> and the cost of the suit, including a reasonable attorney's fee, except that
> no person may rely upon any conduct that would have been actionable as

fraud in the purchase or sale of securities to establish a violation of section 1962.

18 U.S.C. § 1964. The court in *Scheidler* found that the text of section 1964(a) unambiguously granted U.S. district courts the power to provide any party—not just the government—with injunctive relief. *Scheidler*, 267 F.3d at 698. The court stated that "Congress explicitly provided for injunctive relief in § 1964(a), although it did not specify in that section which plaintiffs can seek such relief." *Id.* The court in *Scheidler* determined that, because sections 1964(b) and 1964(c) "describe two types of plaintiffs, the government and private plaintiffs, and spell out additional remedies specific to each type, . . . the only logical conclusion is that Congress intended the general remedies explicitly granted in § 1964(a) to be available to all plaintiffs." *Id.* The court rejected the defendant's argument that "despite the general provisions for equitable relief in § 1964(a), injunctive relief is not available to any particular plaintiff unless it is also provided by some other section of the statute." *Id.* According to the Seventh Circuit, such an interpretation would "render § 1964(a)'s provision for injunctive relief a nullity." *Id.* The court found further support for its holding in "Congress's admonition that the RICO statute is to be 'liberally construed to effectuate its remedial purposes.'" *Id.* (citing Pub. L. No. 91-452, § 904(a), 84 Stat. 947 (1970)).

The Supreme Court reversed *Scheidler* on other grounds. *See Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 411 (2003). Specifically, it determined that "[b]ecause all of the predicate acts supporting the jury's finding of a RICO violation must be reversed, the judgment that petitioners violated RICO must also be reversed." *Id.* Without an underlying RICO violation, the Court held that "the injunction issued by the District Court must necessarily be vacated." *Id.* In reaching this holding, the Court

42

expressly did not address the question of "whether a private plaintiff in a civil RICO action is entitled to injunctive relief under 18 U.S.C. § 1964." *Id.* Appellate court decisions that have been reversed on one ground remain binding on other grounds not addressed by the Supreme Court. *See, e.g.*, *Cent. Pines Land Co. v. United States*, 274 F.3d 881, 893–94 (5th Cir. 2001) (finding that the Fifth Circuit's precedent "binds us on the issue . . . despite its reversal by the Supreme Court" "on other grounds"); *People of State of Ill. v. Lever Bros. Co.*, 530 F. Supp. 293, 295 (N.D. Ill. 1981) (finding that a Supreme Court decision that "did not address the Seventh Circuit's holding" on a particular issue and reversed on other grounds did not cause the remainder of the Seventh Circuit's decision "to evanesce as though never written"). Because the Supreme Court did not touch the portion of *Scheidler* at issue here, this Court is bound by *Scheidler*'s conclusion regarding the availability of injunctive relief for private plaintiffs under 18 U.S.C. § 1964(a).

### 2.    Predatory Loan Prevention Act (Count 3)

The Gatzke Defendants contend that Dixon's claim that they violated the Illinois Predatory Loan Prevention Act (Count 3) should be dismissed for two reasons. First, they argue that Dixon fails to plausibly allege that they are "lenders" such that they fall under the ambit of the PLPA. Second, they argue that the complaint lacks facts establishing them as a proximate cause of any of Dixon's alleged damages.

The PLPA prohibits a lender from "contract[ing] for or receiv[ing] charges exceeding a 36% annual percentage rate on the unpaid balance of the amount financed for a loan." 815 ILCS 123/15-5-5. It is clear from the attached loan agreements that the two loans Dixon took out with Bright Lending exceed this 36% limit. *See* Def. Newport

Funding's Mot. to Dismiss Exs. A–B.

> The PLPA broadly defines a "lender" as
>
> any person or entity, including any affiliate or subsidiary of a lender, that
> offers or makes a loan, buys a whole or partial interest in a loan, arranges
> a loan for a third party, or acts as an agent for a third party in making a loan,
> regardless of whether approval, acceptance, or ratification by the third party
> is necessary to create a legal obligation for the third party, and includes any
> other person or entity if the Department determines that the person or entity
> is engaged in a transaction that is in substance a disguised loan or a
> subterfuge for the purpose of avoiding this Act.

815 ILCS 123/15-1-10.  The PLPA further expands who may be held liable under the

Act by providing that

> [i]f a loan exceeds the rate permitted by [the Act], a person or entity is a
> lender subject to the requirements of this Act notwithstanding the fact that
> the person or entity purports to act as [a] . . . service provider . . . if . . . the
> totality of the circumstances indicate that the person or entity is the lender
> and the transaction is structured to evade the requirements of this Act.

815 ILCS 123/15-5-15(b).  Relevant to Dixon's allegations, the PLPA provides that

"[c]ircumstances that weigh in favor of a person or entity being a lender include, without

limitation, where the person or entity . . . predominantly designs, controls, or operates

the loan program."  815 ILCS 123/15-5-15(b)(3).

Dixon contends that the Gatzke Defendants qualify as lenders under the PLPA

because they "handle, among other things, marketing messages, loan applications, loan

payments, and underwriting for the lending enterprise, all while receiving profit-based

payments" and cites to the portion of the complaint containing these allegations.  Pl.'s

Resp. in Opp. to Gatzke Defs.' Mot. to Dismiss at 17.  The Court agrees; Dixon has

plausibly alleged that the Gatzke Defendants are lenders within the meaning of the

PLPA.  Dixon outlines a scheme in which the Gatzke Defendants direct the functions of

Bright Lending while purporting to provide only limited contractual services.  In

44

particular, defendant McCabe's statement that IMDG "hired non-tribal third parties" like the Gatzke Defendants "to help it to build capacity and provide education about online consumer lending" supports a plausible inference that the Gatzke Defendants were directly involved in the design of the loan program.  McCabe Decl. ¶ 12.  And as indicated above, Dixon's loans from Bright Lending assign interest rates much higher than the PLPA legally allows.  At this early stage of the case, these allegations are enough to plausibly state a violation of the PLPA against the Gatzke Defendants.  Accordingly, the Court denies their motion to dismiss count 3.

### 3.    Unjust enrichment (Count 4)

The Gatzke Defendants contend that Dixon's claims for unjust enrichment (Count 4) must be dismissed against them for several reasons.  First, they argue that remedies under the PLPA are exclusive and therefore preclude any common law claims.  They next contend that Dixon has failed to allege an underlying contractual or tort duty that could give rise to an unjust enrichment claim.  They also assert that "[u]nder Illinois law, there is no stand-alone claim for unjust enrichment," and because the other claims must be dismissed the unjust enrichment claim cannot survive.  *See Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 648 (7th Cir 2019).

Under Illinois law, to state a claim for unjust enrichment, "a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violate the fundamental principles of justice, equity, and good conscience."  *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 516 (7th Cir. 2011) (quoting *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 160, 545 N.E.2d 672, 679 (1989)).  Dixon alleges that the Gatzke Defendants violated

45

federal and state law to conduct the lending scheme at issue and were unjustly enriched when Dixon paid back his loans at a usuriously high interest rate.

The Court is not persuaded by defendants' arguments. Under Illinois law, a statutory remedy is exclusive "[w]here a statute creates a new right or imposes a new duty or liability[] unknown to the common law[] and at the same time gives a remedy for its enforcement." *Kosicki v. S.A. Healy Co.*, 312 Ill. App. 307, 314, 38 N.E.2d 525, 528 (1941). On the other hand, "[i]f no remedy is prescribed[,] the right or liability may be enforced by the appropriate remedy already provided." *Id.* "Where a new remedy is given by statute, and there are no negative words or other provisions making it exclusive, it will be deemed to be cumulative only and not to take away prior remedies." *Id.* The defendants have failed to point to any language in the PLPA making its remedies exclusive, and the Court finds none. *See* 815 ILCS 123/15-10-5. The Court therefore concludes that the remedies available under the PLPA are not exclusive and thus that the existence of the statutory claim does not preclude a claim for unjust enrichment.

Finally, defendants' argument that count 4 must be dismissed for lack of an underlying tort is unavailing. First of all, the Court has declined to dismiss any of the other claims against the Gatzke Defendants, meaning that there are, at this point, underlying torts. And that aside, "[t]he Illinois Supreme Court appears to recognize unjust enrichment as an independent cause of action." *Cleary*, 656 F.3d at 516. The court in *Cleary* noted "apparently conflicting language" regarding whether unjust enrichment could survive as a stand-alone claim in two Illinois Supreme Court cases. The Seventh Circuit resolved this discrepancy by determining that an unjust enrichment

46

claim "is often due to some improper conduct by the defendant" and "usually this improper conduct will form the basis of another claim against the defendant in tort, contract, or statute." *Id.* at 517. Here, the improper conduct that is alleged is clear: Dixon contends that the Gatzke Defendants violated federal and state law when executing the allegedly illegal lending scheme.

For these reasons, the Court overrules the Gatzke Defendants' motion to dismiss count 4.

### 4. Civil conspiracy (Count 5)

The Gatzke Defendants also seek dismissal of Dixon's civil conspiracy claim (Count 5). They assert, similar to their argument regarding the unjust enrichment claim, that the PLPA preempts a cause of action for civil conspiracy and similarly contend that "[u]nder Illinois law, civil conspiracy is not an independent cause of action and will not lie when the plaintiff fails to state an underlying tort." Gatzke Defs.' Mem. in Supp. of Mot. to Dismiss at 19 (citing *Horist v. Sudler & Co.*, 941 F.3d 274, 281 (7th Cir. 2019)).

For the same reasons explained in the previous section, defendants' arguments regarding the PLPA are unavailing. The Court also declines to dismiss count 5 for lack of an underlying tort. Dixon has plausibly alleged a violation of the PLPA, and a violation of the PLPA is a violation of the ICFA. *See* 815 ILCS 123/15-10-5(b). Illinois district courts have found that "a damages action under the ICFA sounds basically in tort—the statute merely defines a new legal duty, and authorizes the courts to compensate a plaintiff for the injury caused by the defendant's wrongful breach." *See Kremers v. The Coca-Cola Co.*, 714 F. Supp. 2d 912, 918 (S.D. Ill. 2009). In short, Dixon's allegation that the Gatzke Defendants violated the PLPA and by extension the

47

ICFA is sufficient to plausibly underpin a civil conspiracy claim.

The Court thus denies defendants' motion to dismiss count 5.

### 5.    Declaratory Judgment Act (Count 6)

Finally, the Tribal Defendants argue that Count 6 must be dismissed against them because declaratory judgment is a form of relief and not an independent cause of action.[3]  They contend that Dixon's sixth cause of action for relief under the Declaratory Judgment Act, 28 U.S.C. § 2201, "fails to state a cognizable, independent claim."  Br. in Supp. of Tribal Defs.' Mot. to Dismiss at 11.

The Court declines to dismiss Count 6 at this time.  "Parties routinely invoke the Declaratory Judgment Act to clarify the parties' rights and obligations in a contract."  *Got Docs, LLC v. Kingsbridge Holdings, Inc.*, No. 19 C 6155, 2021 WL 4634719, at *2 (N.D. Ill. Oct. 7, 2021).  A district court has discretion to entertain a request for declaratory judgment and "make a determination on the request for declaratory relief at the time it decides the substantive claims before it."  *Id.*  The Court does so here and will revisit this claim at the appropriate time.[4]

---

[3] The Gatzke Defendants also argue that Count 6 should be dismissed against them for the same reason.  Count 6, however, is only brought against the Tribal Defendants. The Court therefore does not address the Gatzke Defendants' arguments related to Count 6.

[4] In the complaint, Dixon seeks declaratory relief that his loans are "void and unenforceable" and that he is "not obligated to pay any principal and/or interest outstanding on the illegal loans."  Compl. ¶ 169.  According to defendant McCabe, "ANF has voided and written off the unpaid balance on Mr. Dixon's second loan" and that "he has no further repayment obligations to ANF."  McCabe Decl. ¶ 20.  The requested relief sought may therefore be unnecessary, though that is not entirely clear at this point.

**Conclusion**

In summary, the Court concludes that it lacks personal jurisdiction over Newport Funding and therefore grants Newport Funding's motion to dismiss under Rule 12(b)(2) [dkt. no. 45]. The Court otherwise denies the defendants' motions to dismiss [dkt. nos. 40, 43]. Defendants are directed to answer the remaining claims by no later than July 24, 2025. They are also directed to confer regarding a discovery and pretrial schedule and are to file a joint status report with a proposed schedule by July 10, 2025. A telephonic status hearing is set for July 15, 2025 at 9:10 a.m., using call-in number 650-479-3207, access code 2305-915-8729. The telephonic status hearing set for July 7, 2025 is vacated.

MATTHEW F. KENNELLY
United States District Judge

Date: July 1, 2025